# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JOHN VALERIO,

               Petitioner,

    v.

SCOTT FRAUENHEIM, Warden,

               Respondent.

Case No. 2:17-cv-07706-MAA

**MEMORANDUM DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

     On October 20, 2017, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. ("Petition," ECF No. 1.) The Petition challenges a 2014 judgment of conviction Petitioner sustained in the Los Angeles County Superior Court. ("Petition MP&A," ECF No. 1-2, at 9-10.)[1] On October 2, 2018, Respondent filed an Answer. ("Answer," ECF No. 35.) Petitioner filed a Reply on December 19, 2018. ("Reply," ECF No. 43.)

---

[1] Pinpoint citations of briefs, exhibits, and Lodged Documents ("LD") in this Order refer to the page numbers appearing in the ECF-generated headers. Pinpoint citations of the Clerk's Transcript ("CT," ECF Nos. 18-1 to 18-3) and Reporter's Transcript ("RT," ECF Nos. 18-4 to 18-8) refer to the transcripts' own volume- and page-numbering schemes.

Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a United States Magistrate Judge.  For the reasons stated below, the Court denies the Petition and dismisses this action with prejudice.

## II.    PROCEDURAL SUMMARY

In Los Angeles County Superior Court, a jury convicted Petitioner of arson (Cal. Penal Code §§ 451(c)), finding true a special allegation that Petitioner used a device designed to accelerate the fire or delay ignition (Cal. Penal Code § 451.1(a)). (3 CT 531.)  The jury also convicted Petitioner of insurance fraud (Cal. Penal Code § 550(a)(1)) and conspiracy to commit arson (Cal. Penal Code § 182(a)(1)).  (3 CT 532-33.)  The trial court sentenced Petitioner to state prison for a total term of eleven years.  (3 CT 553-54; 5 RT 2733-35.)

Petitioner appealed his judgment of conviction to the California Court of Appeal.  (3 CT 558; LD 3.)  The Court of Appeal issued a reasoned decision denying Petitioner's appeal and affirming the judgment.  *People v. Valerio*, No. B260150, 2016 Cal. App. Unpub. LEXIS 1357 (Cal. Ct. App. Feb. 23, 2016).  (LD 5.)  Petitioner did not seek review in the California Supreme Court.  (*See* LD 6 (Court of Appeal docket).)

Petitioner, acting *pro se*, filed a petition for writ of habeas corpus in the Los Angeles County Superior Court on July 7, 2016.  (LD 7.)  The Superior Court denied the *pro se* petition on July 20, 2016.  (LD 8.)  On March 23, 2017, Petitioner, now represented by counsel, filed a second petition for writ of habeas corpus in the Los Angeles County Superior Court.  (LD 9.)  On April 4, 2017, that court denied the second petition in a reasoned decision.  (LD 10.)  On May 26, 2017, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (LD 11.)  On June 29, 2017, the Court of Appeal denied the petition in a reasoned decision.  (LD 12.)  On August 2, 2017, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (LD 13.)  On October 11, 2017,

that court denied the petition without comment or citation of authority. *In re Valerio*, No. S243556, 2017 Cal. LEXIS 8126 (Cal. Oct. 11, 2017). (ECF No. 1-3, Exhibit 11, at 120.)

Petitioner filed the Petition in this Court on October 20, 2017. On February 26, 2018, Respondent moved to dismiss the Petition. (ECF No. 15.) The Court denied the motion without prejudice and ordered Respondent to respond to the Petition. (ECF No. 22.) Respondent filed the Answer on October 2, 2018. Petitioner filed the Reply on December 19, 2018.

## III.  FACTUAL SUMMARY

Pursuant to 28 U.S.C. § 2254(e)(1), a factual summary from a state appellate court's opinion is entitled to a presumption of correctness that may be rebutted only by clear and convincing evidence that the facts were otherwise. *See Hedlund v. Ryan*, 854 F.3d 557, 563 (9th Cir. 2017). Petitioner does not challenge the following summary of the evidence presented at trial as described in the California Court of Appeal's decision of Petitioner's direct appeal:

> Defendant [John Valerio] was the Chief Financial Officer and co-owner of Globotech, an electronic parts distribution company. Globotech's offices were located in a two-story concrete slab building in Santa Clarita, California. On October 24, 2009, at approximately 9:30 p.m., an explosion and fire burned Globotech's offices.
>
> . . .
>
> Defendant and his business partner Sergio Ramirez (Ramirez) opened Globotech in 2007. By 2009, Globotech—which was funded by investors, many of whom were defendant's family members and friends—faced financial difficulties. The company sold two different categories of parts, electronic components and telecommunications equipment. In 2009, the electronic components part of the business

3

was foundering because the parts were not selling.[fn 1]  The telecommunications equipment side of the business, however, was doing better.  These circumstances caused a falling out between defendant and Ramirez in July or August of 2009.  Ramirez wanted to dissolve the company and focus solely on selling telecommunications equipment.  Defendant, however, felt pressure to return the amount his family and friends had invested in Globotech, and Ramirez's plan to dissolve the company would prevent them from recouping their investments, which totaled about $1 million in the aggregate.  Ramirez decided to leave Globotech to start his own telecommunications company, leaving defendant to run Globotech with one other employee in Santa Clarita, Ron Reyes (Reyes).

> fn 1:  The defense admitted documents at trial intended to show that, shortly before the fire at Globotech, defendant did have one or more pending deals to sell electronic components. During closing argument, the prosecution argued the components referred to in the documents were not among the components inside the Globotech building when the fire occurred.

Defendant also faced personal financial difficulties in 2009. Scott Lollis (Lollis), a Globotech employee who was also a long-time acquaintance of defendant's, observed defendant was "pretty stressed" in the beginning of 2009 and asked defendant what was wrong. Defendant told Lollis that the Internal Revenue Service was suing him for $500,000.  Defendant was also going through a contested divorce in 2009 and was having "some issues" because his wife was demanding defendant pay her a greater amount of money per month than he was then paying.

From the time Globotech opened until Ramirez left in mid-2009, the company had been uninsured.  After Ramirez left the company,

defendant contacted a Farmer's Insurance representative to procure insurance for Globotech's property, including its parts inventory. The representative visited the Globotech premises on three or four occasions in August 2009 to discuss insurance terms and inspect the location.[fn 2] Defendant told the representative that he did not need insurance to cover any damage to the building itself, which defendant was leasing; defendant wanted insurance only for Globotech's property inside. Defendant said Globotech's inventory was worth almost $2 million, but he wanted to see insurance quotes for policies that would cover losses at four different values, $1 million, $2 million, $3 million, and $4 million, because he was planning on increasing inventory. The Farmer's representative told defendant there was no reason to write him a policy for $4 million if he only had $2 million in inventory because it was easy to increase the policy's covered loss amount once inventory actually increased; in the representative's view, paying premiums on a $4 million policy would be like "paying for a car two months before you bought it." Defendant, however, told the representative he wanted $4 million in coverage, and the representative issued a policy with coverage for that amount to take effect on September 11, 2009.

> fn 2: The Farmer's Insurance representative observed "a bunch of pictures" on defendant's desk during his first visit, and defendant told him they were pictures of his children and his girlfriend. On one of the subsequent visits, the representative noticed the photos were gone, which he found odd.

Around the same time that defendant was insuring the business, late July and August of 2009, defendant also had an alarm system installed at Globotech's offices and had the locks changed on the

building's front door. When the alarm system was installed, defendant and his sole employee Reyes were the only ones who were given codes to arm and disarm the system. Each man had a different code, and defendant did not know Reyes's code nor did defendant disclose his own code to Reyes (or, as defendant would later claim after the fire, anyone else). The locks that defendant had installed at Globotech's offices were "Laser Tech" locks that are nearly impossible to pick because of their advanced design. Defendant and Reyes were the only people that had keys to the locks.

On Friday, October 23, 2009, the day before the fire at Globotech, defendant was the last to leave the office at the end of the day. He locked the doors and he set the alarm when he left the premises.

The next day, the day of the fire, Reyes was not at Globotech to the best of defendant's knowledge. Defendant took an overnight trip to Disneyland with his kids and girlfriend. At 6:20 p.m. that day, someone entered Globotech's offices and deactivated the alarm system using defendant's alarm code. The alarm was then reactivated at 8:31 p.m. using the same code.

Cell phone records revealed 14 calls were made from a phone registering with a cellular tower in the area of Globotech's offices between 5:42 p.m. and 8:39 p.m. on the evening of the fire. Among the calls was a 6:39 p.m. call to defendant (19 minutes after the Globotech alarm was deactivated) and another call to defendant at 8:39 p.m. (eight minutes after the alarm had been reactivated). Just under an hour after the 8:39 p.m. call to defendant, the explosion and fire occurred at Globotech.

///

Firefighters responded to Globotech that evening, and the scene when they arrived was atypical because there was debris in the front of the building and an obvious odor of gasoline in the air that indicated there had been some type of explosion. The next day, Los Angeles County Sheriff's Detective Michael Digby, an arson investigator, assembled a team and travelled to Globotech to investigate the explosion and fire.

At the scene of the fire, Detective Digby observed an oily substance on the asphalt near the building and he could smell gasoline. He observed explosion debris near the front door, and a butane lighter was found in explosion debris littering the parking lot. A large roll-up door at the rear of the building had been blown out, and the front door had blown off intact and the lock had not been tampered with. The building's front door was the only door that could be opened from the outside, and there were no observed signs of forced entry into the building.[fn 3] The walls of the building were over 20 feet high, and the only access to the roof was via a ladder inside the building.

> fn 3: At trial, defense counsel called Detective Digby as a witness during the defense case and asked him questions concerning several photographs of a skylight in the roof of the building that the defense believed could have been a point of forced entry. On cross-examination, however, Digby testified the skylight was damaged by the explosion and showed no signs of forced entry.

Inside the building, investigators found a red gasoline can in an office area. The carpet in the office area had irregular burn patterns, which according to Digby could indicate the presence of an ignitable fluid at the time of the fire. A carpet sample taken from the business tested positive for the presence of gasoline.

*///*

7

On the roof of the building, Digby found a pool of an oily substance and three road flares that had burned to varying degrees. Digby testified that he had come across road flares many times in the arsons he previously investigated. Two of the flares on Globotech's roof were in the pool of liquid and one was not. Several dozen holes had been drilled into the roof for the purpose of permitting the fluid, later confirmed to be oil, to drain into the building.

Based on his investigation, Digby believed the road flares on the roof were not what ignited the fire. He believed the road flares had been thrown onto the roof from the walkway in front of the building, and two of the flares had been extinguished by the liquid while the third burned down on its own. (Digby explained that road flares may not ignite a liquid, particularly a liquid like oil that is not especially flammable, because the liquid chokes off the oxygen necessary to start a fire.) Instead, Digby opined that the fire originated in the mail slot at the front door when someone used the lighter investigators found in the debris to set the gasoline on fire. Digby believed, based on the amount of preparation involved, that more than one person was involved in starting the fire at Globotech and that when the perpetrators who attempted to start the fire observed that the flares on the roof had been ineffective, at least one person then went back and started the fire at the mail slot by using the lighter.

In Digby's expert opinion, the fire and explosion were a deliberate act of arson, and he also believed there were indicia the arson was committed for profit. Digby based his arson conclusion on the presence of the disposable lighter, the gasoline can, and the ignitable pour patterns in the office. As to his belief the arson may have been committed for profit, Digby found it significant that there

were no personal photographs or personal memorabilia in the office, and that most of the desk drawers in the office were empty. Digby explained that in his prior experience with cases where someone had intentionally burned their own house, vehicle, or other commercial property, the owner had often removed personal items before the fire or replaced such items with things that are less personal. Digby also believed profit may have been the motive for the Globotech arson because defendant obtained an insurance policy just six weeks before the fire; as Digby explained, insurance fraud was the most typical form of arson for profit.

Two days after the explosion and fire at Globotech, defendant called his Farmer's Insurance representative and told him what had happened. The representative told defendant to call the claims department but warned him it was "probably going to look a little fishy." Defendant submitted an insurance claim for $4,713,058.27 in losses as a result of the fire.

Three days after the explosion and fire, Detective Digby interviewed defendant in the parking lot outside the Globotech building. In that interview, Digby asked defendant whether Ramirez could have been responsible for setting the fire. Defendant said probably not, because it wasn't in Ramirez's nature, but defendant did tell Digby it could have been Nigerians in Lagos, Nigeria that had run an internet scam and embarrassed him. Detective Digby also asked defendant about his whereabouts on the day of the fire at Globotech. Defendant related his comings and goings in great detail, including his attendance at a little league baseball game and the overnight visit to Disneyland. Defendant also had receipts documenting his whereabouts on October 24, 2009, which he provided to Digby "right then and

there" during the interview. Digby thought this was unusual because, in his prior experience, business owners generally did not feel a need to account for where they were at the time of a fire in such tremendous detail.

(LD 5, at 2-8 (footnotes renumbered).)

## IV.    STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d) ("Section 2254(d)"), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Pursuant to AEDPA, the "clearly established Federal law" that controls federal habeas review of state-court decisions consists of the holdings, as opposed to the dicta, of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Although a state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See id.* at 391, 412-13. A state-court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts binding governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v.*

*Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) ("[I]f the circumstances of a case are only 'similar to' our precedents, then the state court's decision is not 'contrary to' the holdings in those cases."). When a state-court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *See Williams*, 529 U.S. at 406.

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review "only if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *Packer*, 537 U.S. at 11 (quoting Section 2254(d)). A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406 (providing, as an example, that a decision may state the *Strickland* standard correctly but apply it unreasonably). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford v. Viscotti*, 537 U.S. 19, 27 (2002) (per curiam). An objectively unreasonable application is "not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Instead, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The same standard of objective unreasonableness applies where the petitioner is challenging the state court's factual findings pursuant to Section 2254(d)(2). *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual

///

11

determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding . . . .").

With respect to all grounds for relief in this action, the California Court of Appeal rejected Petitioner's claims on the merits in a reasoned decision denying his petition for habeas relief.  (LD 12.)  The California Supreme Court denied a subsequent habeas petition without comment or citation of authority.  (ECF No. 1-3, Exhibit 11, at 120.)  For the purpose of AEDPA review, the California Court of Appeal's denial of Petitioner's claims is the relevant state-court adjudication.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (where state supreme court decision is unexplained, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning"); *see also, e.g.*, *Ibrahim v. Kernan*, 776 F. App'x 509, 509 (9th Cir. 2019) (looking through California Supreme Court's summary denial of habeas petition to Court of Appeal's reasoned denial of habeas petition, "the last reasoned state court opinion").

## V.     DISCUSSION

Petitioner asserts three grounds for relief:

1.     The trial court improperly deprived Petitioner of his Sixth Amendment right to counsel.

2.     Petitioner's trial counsel rendered constitutionally ineffective assistance.

3.     Petitioner is actually innocent of the crimes for which he was convicted.

(*See* Petition MP&A at 6.)  The Court considers each of these grounds and concludes that Petitioner is not entitled to federal habeas relief.  Consequently, the Petition is denied.

///

12

## A. Ground One

In Ground One, Petitioner alleges that the trial court improperly deprived Petitioner of his Sixth Amendment right to counsel. Although the parties do not explicitly contemplate subclaims within Ground One, the Court divides the analysis of this ground into two components: (1) the trial court committed constitutional error by ordering that Petitioner's retained counsel, Mr. Levine, be relieved as counsel; and (2) the trial court committed constitutional error by requiring Petitioner to obtain replacement retained counsel within ten days after Mr. Levine's removal, and by requiring Petitioner's replacement counsel to be prepared to try the case within sixty days after retention. (*See* Petition MP&A at 34-40.) For the following reasons, AEDPA precludes relief on both bases, so Ground One must be denied.

### 1. Legal Standard

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to assistance of counsel protects "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *see also United States v. Rivera-Corona*, 618 F.3d 976, 979 (9th Cir. 2010) (noting that the right to be represented by counsel of choice is "independent and distinct from the right to effective counsel").

"[T]he essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer who he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Accordingly, the right to counsel of choice is not absolute, and may be revoked to serve a "compelling purpose," such as the fair, ethical, efficient, and orderly administration of justice. *United States v. Ensign*, 491 F.3d 1109, 1114 (9th

Cir. 2007); *see also, e.g.*, *United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002); *United States v. Ries*, 100 F.3d 1469, 1471 (9th Cir. 1996). Moreover, "[a] defendant does not have the right to be represented by (1) an attorney he cannot afford; (2) an attorney who is not willing to represent the defendant; (3) an attorney with a conflict of interest; or (4) an advocate (other than himself) who is not a member of the bar." *Miller v. Blacketter*, 525 F.3d 890, 895 (9th Cir. 2008) (citing *Wheat*, 486 U.S. at 159). The Supreme Court also has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citations omitted). For example, trial courts have discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Id.* at 152; *see also Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) ("[O]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to assistance of counsel." (citation and quotation marks omitted)).

"Where the right to be assisted by counsel of one's choice is wrongly denied, . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry" because "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants." *Gonzalez-Lopez*, 548 U.S. at 148. In other words, "erroneous deprivation of the right to counsel of choice . . . unquestionably qualifies as 'structural error.'" *Id.* at 150 (citation and quotation marks omitted).

2.     Relevant Facts

Petitioner was charged by criminal complaint and arrested in January 2011. (*See* 2 RT B-6.) Petitioner was represented at his preliminary hearing on October 25, 2011; November 4, 2011; November 28, 2011; and December 21, 2011 by privately retained counsel, Mark Geragos. (*See* 1 CT 4; 1 CT 82; 2 CT 190; 2 CT

309.)  At the conclusion of the preliminary hearing, the trial court held Petitioner to answer.  (2 CT 419-20.)  Mr. Geragos noted that he had not yet been retained to represent Petitioner beyond the preliminary hearing.  (*See* 2 CT 420.)

Mr. Geragos appeared at Petitioner's arraignment call on January 4, 2012.  (3 CT 437.)  The court continued the arraignment "to enable defendant to retain Mr. Geragos to represent him in this matter."  (*Id.*)  The court continued the arraignment twice more for this purpose.  (*See* 3 CT 439-40.)  On the fourth arraignment call, having been advised that the Public Defender was still determining whether defendant qualified for representation, the court continued the arraignment yet again.  (3 CT 441.)  Finally, on March 16, 2012, the fifth occasion on which the case was called for arraignment, Public Defender Andrea Gilliam was appointed as Petitioner's counsel, and Petitioner was arraigned.  (3 CT 443.)  Even so, Petitioner represented to the trial court that he still was attempting to retain Mr. Geragos.  (3 CT 444.)

At a pretrial conference on April 4, 2012, the court continued the conference "to allow [Petitioner] to hire private counsel."  (3 CT 445.)  At the continued pretrial conference on April 23, 2012, Petitioner again expressed that he "wishe[d] to hire private counsel," and the court cautioned that "he must do so before the next court date."  (3 CT 447.)  On May 23, 2012, at the third pretrial conference call, the court minutes note that Petitioner "ha[d] not yet retained private counsel after the court continued the matter for the same purpose."  (3 CT 449.)  The court indicated that the case would proceed with Ms. Gilliam as Petitioner's counsel.  (*See id.*)

Additional pretrial conferences were called and continued on June 27, 2012; August 1, 2012; September 13, 2012; October 16, 2012; December 13, 2012; January 23, 2013; February 28, 2013; March 1, 2013; and April 17, 2013.  (3 CT 451-60.)

On May 29, 2013, Petitioner substituted a privately retained attorney, Leonard Levine, for Ms. Gilliam.  (3 CT 461.)  The court relieved Ms. Gilliam and

continued the pretrial conference. (*Id.*) On June 19, 2013, pursuant to a stipulation of the parties, the court continued the conference for three months, stating that "there [would] be no further continuances granted absent good cause." (3 CT 463.) On September 16, 2013, the court set a pretrial conference for October 17, 2013 and a jury trial for November 4, 2013. (3 CT 464.) On October 17, 2013, Mr. Levine did not appear personally, instead sending a substitute, Kristen Richards. (*See* 3 CT 466; 2 RT B-8.) The court set an October 25, 2013 hearing. (*Id.*)

On October 23, 2013, Mr. Levine filed a motion to continue the trial pursuant to California Penal Code section 1050 ("Section 1050" or "1050").[2] (*See* 2 RT B-8 to -9.) Mr. Levine requested the continuance on the bases that he had been experiencing health issues for which his physician advised him not to conduct trials for two months, and that he had a preplanned, prepaid vacation that would make him unavailable until the end of January 2014. (2 RT B-9.) The court granted the Section 1050 motion, vacated the trial date, and set a trial-setting conference for January 30, 2014. (3 CT 467.)

On January 28, 2014, two days before the trial-setting conference, Mr. Levine filed a second Section 1050 motion. (*See* 2 RT B-9.) Mr. Levine outlined other cases in which he served as counsel that had become delayed due to his health issues, cases that had statutory priority to Petitioner's case. (*See* 2 RT B-9 to -11.) At the January 30, 2014 pretrial conference, neither Petitioner nor Mr. Levine were present; Mr. Levine again sent Ms. Richards as his substitute. (3 CT 469; *see also* 2 RT B-10 (indicating Petitioner was absent due to a short-term hospitalization).) The trial court issued a bench warrant and trailed the case to February 7, 2014. (3 CT 469; 2 RT B-10.) On that date, the trial court granted the second Section 1050

---

[2] Mr. Levine's Section 1050 motions are not part of the record. The Court presumes, as Petitioner does, that the trial judge's descriptions of the Section 1050 motions are accurate. (*See* Petition MP&A at 20-21 (citing trial court's descriptions in Reporter's Transcript for contents of Section 1050 motions)).

motion, setting a pretrial conference for February 24, 2014 and a trial to commence on March 6, 2014. (3 CT 470.) The court held the February 24, 2014 pretrial conference and kept the trial date as previously set. (3 CT 472.)

On March 6, 2014, the case was called for jury trial. (3 CT 473.) Mr. Levine appeared with Michael Chaney on Petitioner's behalf. (*See* 2 RT A-1.) The parties stipulated to a continuance on the basis that the prosecution "had discovered some witness availability problems" the day before, and the court once again continued the trial, this time to May 14, 2014. (*Id.*; *see also* 3 CT 473.) The trial judge stated on the record, "[T]he trial date is fixed, it's not going to be continued. Everybody will be expected to be ready." (2 RT A-5.)

On May 6, 2014, Mr. Levine filed a third Section 1050 motion in which he indicated that, due to an April 25, 2014 angiogram procedure, his cardiologist told him to refrain from stressful activities, including trials, for one month after the procedure. (*See* 2 RT B-14 to -15.)

On May 14, 2014, the trial court called the case to trial. (2 RT B-1.) Mr. Levine appeared with Mr. Chaney on Petitioner's behalf. (*Id.*) The prosecutor, Deputy District Attorney Sean Carney, was not prepared to proceed because the prosecution had called off witnesses due to the pending Section 1050 motion. (*See* 2 RT B-1 to -2.) Mr. Levine reiterated that his cardiologist forbade him from trying any cases for a month after his angiogram, and that another Superior Court judge had scheduled a trial in another case to begin at the end of that month. (*See* 2 RT B-2 to -5.) Mr. Levine confirmed that he had not been in trial since February 6, 2014. (2 RT B-5.) The trial judge then stated the following:

> Let me just lay out some history here, because this is not an easy hearing. This is, on a scale of 1 to 10, for me, a 10. . . .
>
> So this comes very difficult for me and I've spent a lot of time reviewing the case, talking with the site supervising judge. . . .

///

17

In terms of the age of this case, the People filed their felony complaint on January 13th of 2011; and Mr. Valerio was arraigned in this case on January 18th, 2011. So this case has been active in our system with a defendant making regular court appearances for three years and four months. Mr. Valerio was originally represented by Mr. Geragos, Mark Geragos; and ultimately Mr. Valerio was held to answer after preliminary hearing on December 21st of 2011. That was two years and four months ago.

So this case was arraigned in my court after some continuances which I granted to Mr. Valerio to try to rehire Mr. Geragos, without success. So his arraignment was pending until March 16th of 2012, and that was his arraignment date. That was two years and one month ago, 789 days since it was first arraigned and sent to my court for that.

On that arraignment date the Public Defender was appointed because Mr. Geragos or any other counsel was not presented to the court by Mr. Valerio. And Andrea Gilliam, from the Public Defender's office, had the case from March 16th of 2012 until, Mr. Levine, you came to my court on May 29th of 2013 to substitute in.

Now, I don't know about your memory of our conversation on that day, but you—some of it was, based upon our relationship, in chambers, informal; some of it was on the record. But I'm certain that I told you that if you were going to come into the case, that I was expecting to have it resolved within approximately a 60-day period and that when we went on the record, your comment to me was that you expected the case to be tried no later than September of 2011—I'm sorry, 2013. You said, I expect to have this case tried in August, but no later than September, which to my mind was 60 to 90 days, which I was willing to grant you. And I made comments, I believe, about how

the age of this case caused me to want to make sure that this time frame was compressed so that this case could be concluded, because by that time the case was quite old. When you subbed in on May 29th, anybody could do the math to figure out how much older the case was by that time.

But you have had this case for 11-and-a-half months. In fact, two weeks from now will be the one year anniversary of that May 29th date when you subbed in and we had this conversation. Possibly at that time you had no idea what your circumstances would be in terms of your health at that time; but according to your declaration, you had concerns going back earlier than that, given your family history and so forth. . . .

Mr. Valerio had a pending second case at the time, a somewhat similar case in some respects. It was up in the Antelope Valley court. . . . And you dispatched that case pretty quickly. In fact, you settled that case on September 16th of 2013. And Mr. Valerio entered into a plea, opening himself up to a two-year lid. And the representation, at least on the record there, was that that sentencing date would trail this open case. So your client's been pending a sentencing date in that other case since September 16th of 2013.

If I kind of track your declaration, the ones that you provided, I know that after you came in on May 29th of 2013, you got involved in the *Poletti* case, which was a fairly involved case, which you finished in mid-September. And I will say, on July 16th—on September 16th when we were in court, of 2013, I set two dates at that time based upon the discussions that had occurred; and that was that there would be a pretrial date October 17th of 2013, and I actually set a trial date for November 4th of 2013.

On the pretrial date you were not present. On the pretrial date you sent in a substitute, Kristen Richards, to appear on your behalf; and I was not satisfied with that, so I trailed the case to let you get to court. And I trailed that to October 25th to give you time to come. You filed a 1050 on October 23rd, 2 days before that court appearance and after the court date that you were supposed to be here, which was October 17th.

Your 1050 at that time referred the court to your experiencing chest pains. You had spoken to your doctor. Your doctor advised you to have no trials for the next two months. Plus, you had a preplanned, prepaid vacation, as part of your declaration, that would take you to the end of January.

So I considered all of that information. Certainly, no judge wants to even entertain the idea that a lawyer is going to be carted out of his or her courtroom on a gurney during the middle of a trial. It was the first time that you mentioned something about chest pains, but you did talk about the chronic nature of your family history in terms of your—I believe it is your father and your brother, and that there was some evidence that you had your own set of issues with regard to your heart. So I took that for what it said, which was that you were following your doctor's orders and that you were not going to be doing any trial work at all until the end of January of 2014. So I agreed to grant the continuance. I continued the case to January 30th.

I know that you had another case that was to be—that was starting a couple of days before then, so there was another case that was taking priority over this case. So on January 28th, 2 days before the January 30th, 0 of 15 date, you filed your second 1050, at which time you outlined all of the cases that were pending and had been

backed up as a result of your not being able to be in trial essentially because of your health reasons. . . . The first case was estimated to last three weeks, the next one was estimated to last two weeks, the last one was estimated to last a month.

Just keep in mind also in this equation that there was a jury trial date that was set November 4th, 2013, that never took place. . . .

And on January 30th when the court date was set in my court, it was then 8 of 15 because . . . Mr. Valerio had gone into the hospital with some sort of short-term issue that caused him not to be in my court on January 30th. I then, as a result of that, held a bench warrant and trailed his case to February 7th, a short continuance to accommodate Mr. Valerio and also make sure that I could deal with this 1050 with all that it had in it. So on February 7th of 2014 the case was day 8 of 15, and I heard the 1050 on February 7th as a result of that delay. . . .

That was the second time that I had a 1050 well into your handling of this case, which had two components in it. One was a very heavy trial calendar of sexual assault child molestation cases. That's your specialty. You're well known for that. You pointed out to the court on more than one occasion in your declarations that those cases have statutory priority over my case because of child witnesses and so forth, and I'm aware of that. But that's the nature of your practice, which is something that I have to look at as well.

But I did grant your 1050 and, as a result of that, the case was continued for a pretrial date on February 24th, which was a couple of weeks from that date, and a trial date of March 6th of 2014. The People had asked the court and counsel if they could have a reasonable People's continuance because, of course, in this particular case—and

you've given me the opportunity to read the transcripts of the preliminary hearing—this is a witness-intensive case. It's not a very complicated case, but it's got a lot of witnesses involved. So your 1050 put Mr. Carney in the position to have to scramble and coordinate witnesses for the next trial date without knowing in advance whether he would even have those witnesses, which is exactly what happened. So any reference to you being ready on the 3rd of March and Mr. Carney not is very easily explained to me by you having put him in that position, not that you were ready at a certain date and he was not. . . .

I simply waited for the March 6th date to come where I would be ready to go. And, in fact, in all of this you should know that for each time we've set trials, I've blocked out time; and that time bumps other cases, and it is not just a simple putting a bullet in a chamber and rotating it to the next case. There is actual time allotted by this court, and the inconvenience is not only to me and my court but to other courts within this building that is a consequence that maybe lawyers don't think of as much as we do. But it definitely has an impact on the administration of justice in this courthouse and generally.

But on March 5th of 2014 Mr. Carney notified the court of his witness unavailability problems. He actually included in his e-mail that he was prepared to have the case dismissed, which after so much time, to have to even say that was a striking statement that anybody would have to make in a case like this, unless they were absolutely unable to proceed with the case because it was dead in the water. So when he said that, I reminded everybody that there was a stipulation to a People's further continuance. So there wouldn't be a dismissal; but, of course, there once again, having blocked out time for this trial, I

knew that it was not going to happen and my hands were tied. I didn't

know what else to do other than to let the People exercise their

stipulated request for the continuance.

So based upon that, I set the case for May 14th, which is today.

It was no secret during so much of this time period that this trial and

resolution of this case was long overdue. Mr. Levine, you brought in

co-counsel, I believe it was the last time; and he's here today. And you

represented in your declaration that you did that because of the issues

that—the health issues that you have and your calendaring issues, but

that this particular attorney was not going to be able to try the case in

your absence. I don't remember your exact words, but the effect was

he's here to help me, he's not here to replace me.

You also mentioned in previous 1050s, based upon your health

issues and the backup of your calendar, just as important, that you were

considering withdrawing from the case. And you indicated that you

had developed a relationship with Mr. Valerio which caused you to

reject that concept and essentially ask for the indulgence of all of your

judges in all of your cases to allow you to somehow get through all of

the cases that you have that are all serious, time-consuming, stressful

trials, and be able to handle them without having a heart attack,

essentially, bottom line.

And so you filed a 1050 on May 6th of 2014 because you had

had this angiogram April 25th, 2014. And I was wondering, it just

occurred to me while I was going through this, that you had not had a

trial, you were not in the stress of a trial since February 6th; and you

had the angiogram in April, almost the end of April, the 25th. And

based upon that testing period for which you had not been in trial for at

least a couple of months, which is a fairly good resting period, which is

less than your doctor is saying you need in between trials now, that you came up with an order from your doctor not to be engaged in any stressful trials or activity for the next month, which would bring you to the end of May.  So that was curious to me because—I don't mean curious in a suspicious sense.  It's curious that—the question arises, what is your true ability to conduct trials here without completely consuming the court's calendars and getting continuances?  You have a chronic issue here; and it's not a broken leg that heals, it is a chronic heart condition that causes you chest pains when you are in a stressful situation. By definition, your trials are stressful situations.  And I'm not trying to put words in your mouth, but I'm just saying this because I think it is self-evident.

In my e-mail, once I got that 1050, I certainly was having conversations with the site supervisor because, once again, this trial that was blocked for today and for the next two weeks caused me to bump a number of trials and caused the site supervising judge to have to move around quickly and to try to fill that space for me with other cases.  It caused me to continue other cases.  It had impact, as the previous situations had.

And you followed up—that's why I wanted to get a list of your case history since you've been in.  And when I wrote it and I sent it, I felt that in any other situation in life I would never even ask you for such a thing.  I just wouldn't.  I felt terrible having done it, but the rock and the hard place that I'm between and conversations with the site supervising judge compelled me to tell you to get your cardiologist in here to answer some basic questions and for you to outline your future for your cases, which are considerable.

///

I mean, in fact when I read your last declaration it was—and you're impeccable for your honesty; so, unlike other people that file 1050s and you just stick your finger up in the air and hope the wind blows in the right direction, your word is as good as gold, as far as I'm concerned. You lay out in your sense a kind of disappointing situation that you find yourself in, and you lay out all of these cases that are in front of you that have been stacked up as a result of your medical issues.

And so I am spending all of this time, I'm doing it out of respect for you and trying to be accurate about the circumstances. But in that process, you have seven pending cases, all of them except this one statutorily preferred cases because they're all child molest cases. My calculation is, if you did them back-to-back and if you took the two weeks off in between that your doctor tells you you need to do, which I don't know is realistic based upon the February to April circumstances where you weren't even in trial and you were getting heart pains and getting tested and so on—I don't know about the heart pains, but getting tested and getting this news that you can't do anything for the following month, that would be three months of no activity and trial, that you have about 14 to 16 weeks of trial with those cases if I just put them back to back, and another 12 weeks of rest in between all of those. So we're looking at approximately seven months just if you took care of those cases and gave them all priority to my cases, which I know that you would because they are all child molest cases. And I'm not quarreling with that.

The one that you have coming up that you say you went to court, gave the same information about your medical circumstances to Judge Pierce, and he said, okay, well, if you're unable to do any trials until

the end of May, well, you're going to be my next trial . . . . So this court, me, was put in the position of once again saying, do you get a continuance into the end of June or into July because of the totality of these circumstances, with no assurance that you are going to be able to do the case? That's my conundrum. Because I don't have—and I read the doctor's letters. They are, as would be, assessments of your current situation and a current recommendation, which is taken step by step over time. Trials are only going to cause you more stress. And as I said, my fear is that you start a trial in my court and something goes awry, that you are carted off to the hospital or worse, which I would not even want to contemplate, but I have to.

I've also reviewed some case law in the area. I know it's a very—a rare event when a judge removes a private lawyer from a case. It's not about precedent, clearly. But in looking at the totality of these factors, I don't have any confidence at all, frankly, that you will be able to try this case any time soon, and we will just be continuing this case to the next two-month period for which you would have completed one of your other cases, which is fine, only to be faced with a slew of other high profile or high preference cases.

And Mr. Valerio, who has never since he's been in my court demonstrated one wit of desire to have this case completed at trial—I will say that straight up. I have never heard him say or any attorney say that he's demanding his trial right here and now and wants to set it and get it done with. And I don't see that he has an incentive. I don't see anybody having an incentive except the court. I don't see any opposition by Mr. Carney, because he has received your 1050 as par for the course, figures, which he should not have done, but, figures that he could simply call off his witnesses because this judge is going to

grant a continuance under the circumstances. And you even indicated—and I didn't take this lightly at all—that you didn't think it was necessary to provide me with proof of your medical circumstances by way of letters because in a case that's over three-and-a-half years old or approaching on that, that you would not be more comprehensive. . . .

You're not engaged in trial today, but your response is that you're not healthy enough to start this trial. And in fact, in your declaration you got yourself tied into your next trial with Judge Pierce, and you've indicated in your declaration that you can't do this trial because you are spending all of your time getting ready for that trial. So your popularity and your skills are undermining you at this and Mr. Valerio. And I want to point out that this has more to do with him than you, in the sense that it is a defendant's right if he can afford one, it's not an absolute right by any stretch, but it is a right to have a lawyer of his choice if he can hire one, and he's hired you. And you've been in this case for a year and this case is no closer to trial or resolution than it was when you first walked into the case.

So my indicated [sic] is to relieve you. And I'll let you be heard. I know you don't want to and Mr. Valerio, I'm sure he's developed that relationship with you, doesn't want you relieved as counsel, but I don't feel like I have any alternatives.

I do have a Public Defender who is familiar with the case. She's had it for over a year, and I would reappoint her. I would put the case over for about 10 days; and if in the interim Mr. Valerio can have some lawyer come into my court that he wants to hire who is willing to represent without reservation, given all that I've put on the record here and the age of this case, that he or she would be committed to doing

this case within a relatively short period of time, that would be the
circumstances.  Otherwise, the Public Defender would be reassigned to
the case, you'd provide all of your discovery back, and I would tell the
Public Defender to put this case as her first priority.

(2 RT B-5 to -20.)

The trial court gave Mr. Levine an opportunity to be heard, and Mr. Levine
narrated the circumstances surrounding his requests for continuances.  (*See* 2 RT B-
20 to -29.)  Mr. Levine stated that he had associated with another attorney, Michael
Chaney, to assist him with his caseload.  (*See* 2 RT B-23.)  Mr. Levine confirmed
that he did not know when he possibly could begin trial, stating, "I have to see how
I react when I do my next trial, frankly.  And I know I can't guarantee to this court
or any of the other courts what will occur after that." (2 RT B-26.)  The trial judge
concluded:

I still don't have any alternatives that I can think of, other than
to order you to be relieved as Mr. Valerio's attorney.  I have
considered and balanced all of the interests, his, the court's, the
People's.  I see this case as being so old and moving with wheels
spinning.  And I don't believe you have any case that's this old, I can't
imagine, that hasn't been resolved, that's over three years old. . . .

That will be the court's order.

(2 RT B-30.)  The minute order of the hearing states, "The court relieves defense
counsel Leonard Levine based on counsel's medical issues and trial schedule." (3
CT 475.)  The court stated its assumption that Mr. Chaney was not ready to try the
case, to which Mr. Levine and Mr. Chaney did not object, and the court resolved to
reappoint Ms. Gilliam to the case with the expectation that the case would be tried
within sixty days.  (2 RT B-30 to -31; *see also* 2 RT B-14 (recounting that Mr.
Levine's declaration in support of his third Section 1050 motion indicated that Mr.
Chaney could not try the case in his absence).)

After this colloquy, upon being asked to waive his right to a trial within three calendar days, Petitioner declined, stating:

> I want this over. You told me—you said to everybody that I
> don't want this over. I've been living this nightmare for three-and-a-
> half years, even longer. So, you know, I've never been able to speak.
> You never—you've never asked me, do you want this over; but yet
> you put the words in my mouth, saying I've never even made an
> assertion or anything that I want this over. . . . I'd rather come back in
> three days.

(2 RT B-33 to -34.)

After a break, Ms. Gilliam was apprised of the situation, and she indicated that the Public Defender's office would represent Petitioner upon redetermination that he was financially qualified for representation. (*See* 2 RT B-36 to -37.) The trial court reiterated Petitioner's statement that he wanted to finish the case as soon as possible and suggested that the case be tried within sixty days. (2 RT B-37 to -38.) Ms. Gilliam responded, "I don't see that as being realistic," noting other cases she had pending trial in which defendants were in custody. (2 RT B-38 to -39.) Ms. Gilliam posited, "I don't know that anyone could come into this case and be ready in 60 days . . . ." (2 RT B-39.) The trial judge responded:

> I'll just reiterate: the case is over three years old. Okay? That's
> a fact. I've had to go to the extreme of taking Mr. Levine off the case,
> something I've never done before, because I don't have a case like this.
> I just don't. And not have had one. And you're my everyday public
> defender and you've had his case. Maybe it is not plausible that you
> represent him, even though you previously did, because of your trial
> schedule; but I have to find somebody who is, and I don't agree with
> you that no one can be ready for this case in a 60-day period.
> ///

29

He has refused to waive time; at least in the last statement he made, he wants to go to trial within the next three days. Mr. Carney is ready and will be within the next three days. So that's the conundrum. So, as I suggested before, I was going to put the case over for about 10 days, make sure that I have an attorney in place who is able to try the case in a 60-day period, whether it's you, that would be certainly preferable, but you're saying that it might not be realistic. . . .

And if not a Public Defender, then an Alternate Public Defender; and if not an Alternate Public Defender, then a bar panel or somebody who is going to represent that they can take this case and be ready in 60 days. And I'm saying all of this because I was a lawyer for 30 years, and I've had to prepare much more involved cases than this in a 60-day period. I mean, I just had—and you do what you need to do and it's not easy, and I have to find the attorney that's going to be able to do that.

(2 RT B-40 to -41.) After this discussion, Petitioner waived his right to a trial within three days and agreed to a continuance "to May 28, plus an additional 60 days." (2 RT B-43.)

On May 28, 2014, Ms. Gilliam represented to the trial court that Petitioner qualified for representation by the Public Defender and accepted reappointment as Petitioner's counsel. (2 RT C-2.) Ms. Gilliam indicated that she had yet to receive discovery from Mr. Levine, noted that her office would not "put Mr. Valerio's case ahead of any in-custody client who was already pending for trial before we were reappointed." (2 RT C-2 to -3.) The trial judge stated that Petitioner's case is his oldest case and restated that Petitioner "wants to have his trial as soon as possible." (2 RT C-3.) The trial court stated it would keep Ms. Gilliam's representations and obligations in mind, and it set another hearing for June 25, 2014. (2 RT C-4 to -5.)

At the June 25, 2014 conference, Robert Haberer appeared, seeking to substitute for Ms. Gilliam as Petitioner's counsel. (2 RT D-1 to -2.) The court expressed its hesitation to order the substitution:

> I've already excused and relieved one private counsel because his calendar was so congested in the past and up through the future that it was not reasonably likely that he would be ready to try this case in a reasonable period of time.
>
> This case is over two-and-a-half years old, starting with the defendant's arraignment in my court. That does not include all of the months that preceded leading up to the preliminary hearing, which is probably another six months or I don't know how long that was. But this case in my court is the oldest case, possibly the oldest case in the building right now.
>
> So I can tell you that I cannot accept any change of counsel unless there is a commitment to being able to try this case within the next 60 days; and if you can do that and you make that commitment and clear your calendar of everything that would interfere with that, then I would consider the substitution. Otherwise, I can't. And that's the basic position.

(2 RT D-2.) Mr. Haberer committed, "I'll be ready within 60 days," but he also expressed some hesitation with respect to his other commitments. (2 RT D-4 to -5.) The judge said:

> Mr. Levine is a friend of mine and I've known him for many years; and it was one of the harder things I had to do, to take him off the case. And he never made a frivolous motion, but there you go. His, in good faith, was nevertheless a problem in terms of readiness.
>
> . . . I have to have you [Mr. Haberer] understand that I'm going to push

///

you into trial and that's going to be clear if you are—if you agree to be substituted in.

(2 RT D-10 to -11.) The court set a status conference for July 16, 2014, where it expected Mr. Haberer to unequivocally commit to try the case within sixty days. (2 RT D-9 to -10.) At that status conference, Mr. Haberer represented that he would be ready to try the case on September 26, 2014. (2 RT E-2.) The court relieved Ms. Gilliam, permitted the substitution of Mr. Haberer, and scheduled trial to begin on September 26, 2014. (2 RT E-3.) The parties announced ready for trial on that date. (2 RT F-1 to -2.)

In a habeas petition before the California Court of Appeal, Petitioner argued that the trial court's order relieving Levine as Petitioner's counsel and requiring that replacement counsel be prepared to try the case within sixty days violated his federal constitutional right to counsel. (LD 11, at 40-56.) The Court of Appeal denied the petition, opining as to this ground: "Petitioner fails to demonstrate that his Sixth Amendment right to counsel of choice was violated. (See *United States v. Gonzalez-Lopez* (2006) 548 U.S., [sic] 140, 144; *People .v* [sic] *Ortiz* (1990) 51 Cal.3d 975, 982; *People v. Courts* (1985) 37 Cal.3d 784, 790.)" (LD 12, at 1.) Presented with this claim in a subsequent habeas petition (LD 13, at 24-52), the California Supreme Court denied the petition without comment. (ECF No. 1-3, Exhibit 11, at 120.)

### 3. Discussion

As a preliminary matter, the Court addresses Petitioner's argument that the Court of Appeal, by citing *Gonzalez-Lopez*, did not properly rely on applicable precedent because the portion of the opinion stating that a trial court has "wide latitude" to balance the right to counsel of choice with the needs of fairness and the demands of its calendar is dictum. (*See* Reply at 12-14.) Petitioner contends that there are only four limited situations in which the right to counsel of choice may be

abrogated. (*Id.* at 13-14 (citing *Wheat*, 486 U.S. at 159).) As a threshold matter, to the extent this argument was not raised in the Petition, it has been waived. *See, e.g.*, *Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008). Notwithstanding, binding Ninth Circuit authorities have assigned authoritative weight to the passage in *Gonzalez-Lopez* discussing the "wide latitude" afforded trial courts in weighing the right to counsel of choice against the needs of fairness. *See, e.g.*, *Rivera-Corona*, 618 F.3d at 979 (quoting *Gonzalez-Lopez*, 548 U.S. at 152); *Miller*, 525 F.3d at 895 (same). Petitioner's argument appears to be disingenuous given that he concedes the rule stated in *Gonzalez-Lopez* applies. (*See* Reply at 14 ("[T]he Supreme Court has recognized that trial judges are entitled to wide latitude in scheduling trial and granting continuances." (citing *Slappy*, 461 U.S. at 11-12, the same case cited for this proposition in *Gonzalez-Lopez*, 548 U.S. at 152).) The Court of Appeal reasonably cited and applied *Gonzalez-Lopez*, as discussed *infra*.

a.     *Relieving Mr. Levine*

Petitioner contends that the trial court deprived him of his right to counsel of choice by ordering Mr. Levine to be removed from the case. (Petition MP&A at 37.) Petitioner argues that the trial court's adherence to principles of efficient administration of justice conflicted with its grant of continuances to the prosecutor, and that the court erred in its decision by citing Petitioner's silence or inaction with respect to delays, whereas Petitioner endeavored to avoid delays caused by the Deputy Public Defender's requests for continuances by hiring Mr. Levine to represent him. (*Id.*) Respondent contends that the California Court of Appeal reasonably rejected Petitioner's claim because the case had been pending for over three years without a trial; because at the time he was removed, Mr. Levine had represented Petitioner for nearly a year, but he could not articulate to the trial court when he would be able to try Petitioner's case; and because the trial court recited

33

factors informing the administration of justice on the record in its decision to remove Mr. Levine.  (Answer at 33.)  The Court agrees with Respondent.

Per the standard identified in *Gonzalez-Lopez*, 548 U.S. at 152, the trial court expressly weighed the right to counsel of choice against the needs of fairness and the demands of the court calendar:  "I have considered and balanced all of the interests, [Petitioner's], the court's, the People's.  I see this case as being so old and moving with wheels spinning."  (2 RT B-30.)  The detailed explanation the trial court gave at the hearing, reprinted *supra*, reasonably justifies the court's decision to remove Mr. Levine.  Accordingly, the Court concludes that the Court of Appeal's resolution of Petitioner's claim was not objectively unreasonable.

*Bradley v. Henry*, 510 F.3d 1093 (9th Cir. 2007) (en banc), provides a helpful framework for this analysis.  In *Bradley*, the state habeas petitioner claimed the trial court deprived her of her right to counsel of choice by refusing to allow her to substitute retained counsel for appointed counsel.  510 F.3d at 1095-96.  The trial court had "expressed concerns about delays" in denying the substitution.  *Id.* at 1096.  The Ninth Circuit reviewed the various delays in the record before it in order to determine whether the trial court's reasoning was objectively unreasonable.  *Id.* at 1097.

Applying the analytical framework of *Bradley*, the Court reviews the pretrial proceedings summarized *supra* and identifies the following delays introduced, at least in part, by Petitioner himself or by his retained counsel:

| Date | Reason for Delay | Days Elapsed |
|---|---|---|
| Jan. 4, 2012 | Petitioner's request "to enable defendant to retain Mr. Geragos" (3 CT 437) | 22 |
| Jan. 26, 2012 | Petitioner's request "to enable defendant to retain Mr. Geragos" (3 CT 439) | 14 |

| Date | Reason for Delay | Days Elapsed |
|---|---|---|
| Feb. 10, 2012 | Petitioner's "indicat[ion] that he is still attempting to retain Mr. Geragos" (3 CT 440) | 21 |
| Apr. 4, 2012 | Petitioner's request "to allow for further investigation and to allow the defendant to hire private counsel" (3 CT 445) | 19 |
| Apr. 23, 2012 | Petitioner's request (3 CT 447 ("Defense counsel is still waiting for some discovery. If the defendant wishes to hire private counsel, he must do so before the next court date."); *see also* 3 CT 449 ("The defendant has not yet retained private counsel after the court continued the matter for the same purpose.")) | 30 |
| June 19, 2013 | Joint stipulation (3 CT 463 ("Pursuant to stipulation, the matter is continued . . . . [T]here will be no further continuances granted absent good cause.")) | 120 |
| Oct. 25, 2013 | Mr. Levine's first Section 1050 motion filed on Oct. 23, 2013 and heard on Oct. 25, 2013 (3 CT 467; 2 RT B-8 to -9) | 97 |
| Jan. 30, 2014 | Petitioner's hospitalization and Mr. Levine's inability to appear in court (3 CT 469; 2 RT B-10) | 8 |
| Feb. 7, 2014 | Mr. Levine's second Section 1050 motion filed on Jan. 28, 2014 and heard on Feb. 7, 2014 (3 CT 470) | 17 |
| | **TOTAL** | **348** |

Together, Petitioner and Mr. Levine's actions resulted in approximately 348 days—nearly a year—of delays. Moreover, based on the discussion at the May 14, 2014 hearing, Mr. Levine's third Section 1050 motion effectively requested a further delay of indefinite duration because Mr. Levine could not commit to a date by which he would be able to try Petitioner's case. (*See* 2 RT B-26.) The trial court calculated that, given Mr. Levine's trial calendar and present medical condition, the earliest Mr. Levine possibly could try Petitioner's case was seven months after the May 2014 hearing—in other words, no earlier than four years after the government initiated its case against Petitioner. (2 RT B-17; *see also* 2 RT B-6.)

Petitioner argues that, unlike with the continuances requested by Mr. Levine, the trial court accommodated the delays requested by the prosecution and by Ms. Gilliam while she was appointed to represent Petitioner. (Petition MP&A at 35-37; Reply at 10; *see also* 3 CT 445-60 (reflecting continuances given while Ms. Gilliam represented Petitioner).) Petitioner contends that the trial court granted nine continuances over the course of a year to Ms. Gilliam. (Petition MP&A at 35, 37; Reply at 10-11 (citing 3 CT 449-61).) Additionally, Petitioner submitted a declaration averring that he retained Mr. Levine because he was frustrated by Ms. Gilliam's delays. (ECF No. 1-3, Exhibit 4, at 137 ¶ 1.) Petitioner also notes that the trial court appeared to be lenient with respect to any requests for continuances made by the prosecution, including a continuance granted in March 2014, when Petitioner declared ready for trial. (Petition MP&A at 35-36; *see also* 2 RT A-3 to -4 (inviting stipulation for any further reasonable continuance requested by the prosecution).) These comparisons are unconvincing for several reasons.

*First*, aside from Petitioner's declaration and argument, the record before this Court does not indicate the cause of many of the continuances in Petitioner's criminal proceedings while Ms. Gilliam represented him. The trial court's minutes repeatedly state that proceedings were being continued "to allow for further

investigation." (3 CT 451, 452, 454, 455, 457, 459, 460, 461.)  Though Petitioner pins all these continuances on Ms. Gilliam, the minutes do not state on whose motion the court continued the case.  Accordingly, Petitioner's argument lacks support from the Superior Court record.

*Second*, as explained by the trial court, Mr. Carney's request for a continuance in March 2014 was a consequence of Mr. Levine's second Section 1050 motion.  As a result of the second Section 1050 motion, which "put Mr. Carney in the position to scramble and coordinate witnesses for the next trial date without knowing in advance whether he would even have those witnesses" (2 RT B-12), the trial court continued the trial by approximately two weeks.  (*See* 3 CT 473.)  Petitioner does not address the trial court's analysis of this issue, an analysis this Court finds reasonable.

*Third*, the circumstances surrounding Mr. Levine's requests for continuances were distinguishable from the continuances requested by Mr. Carney and Ms. Gilliam given the age of the case and Mr. Levine's representations to the trial court. Mr. Levine substituted into the case on May 29, 2013—over two years after the prosecution began, a year and a half after Petitioner was held to answer, and a year after the deadline the trial court set for Petitioner to retain private counsel.  (*See* 2 CT 420; 3 CT 449, 461; 2 RT B-6.)  Upon his appointment, Mr. Levine represented to the trial court that he expected to try the case no later than August or September 2013—as the trial court understood it, approximately sixty to ninety days after his retention.  (*See* 2 RT B-7.)  Instead, in June 2013 the parties stipulated to a 120-day continuance (*see* 3 CT 463), and Mr. Levine subsequently filed three Section 1050 motions (*see* 3 CT 467, 470; 2 RT B-8 to -9).  Accordingly, Mr. Levine's requests were inconsistent with the expectations of the trial court, as set by Mr. Levine himself, related to the just and speedy resolution of Petitioner's case.

*Fourth*, Mr. Levine's final Section 1050 motion, the motion that precipitated the events of the May 14, 2014 hearing during which Mr. Levine was removed, was

different in kind from the prior continuance requests in the case.  As he acknowledged at the May 14 hearing, Mr. Levine effectively requested a stay of indefinite length because he could not commit to a date by which he could try Petitioner's case given his health condition and the obligations of his other cases. (*See* 2 RT B-26.)  The court previously had warned the parties and attorneys that the May 14 trial date was "fixed," and would not be continued.  (2 RT A-5.)  Thus, Mr. Levine's request for an indeterminate delay after the trial court's admonition presented a different question from the finite delays previously requested and granted in the case.  In sum, Petitioner's argument comparing Mr. Carney and Ms. Gilliam's continuance requests with those of Mr. Levine does not convince this Court that the Court of Appeal's decision of his claim was objectively unreasonable.

Petitioner argues next that the trial court believed Petitioner and Mr. Levine purposefully were delaying the trial, a belief contradicted by Petitioner's readiness for trial in March 2014.  (*See* Petition MP&A 35.)  Petitioner contends that the trial court alleged that he was a cause of, or complicit in, the delays.  (Petition MP&A at 37; Reply at 11-12.)  Petitioner does not provide record citations for his characterization of the record, though he does highlight a passage in which the trial court mentioned Petitioner's silence with respect to the speediness of his trial.  (*See* Petition MP&A at 36.)  In any event, this argument is unconvincing.

*First*, Petitioner does not contend that the judge's observations on the record—that Petitioner "has never since he's been in [the trial] court demonstrated one wit of desire to have this case completed at trial," and that neither Petitioner nor any attorney representing him had "sa[id] that he's demanding his trial right here and now and wants to set it and get it done with" (2 RT B-18)—were inaccurate; he takes issue only with the insinuation suggested by those observations, that he caused previous delays.  (*See* Petition MP&A at 37 (stating that the trial court "chastised him . . . by alleging that Petitioner was one of the causes for the previous

delays").)  *Second*, Petitioner himself did cause at least some delay shortly after he was held to answer, when he indicated to the trial court that he was attempting to retain Mr. Geragos, who represented him at the preliminary hearing, for the remainder of the case.  (3 CT 437, 439, 440, 445, 447, 449.)  In any event, the record does not show that the trial court rested its decision to remove Mr. Levine on the basis that Petitioner himself was one of the causes for delay.  The two reasons for the removal cited in the trial court's minutes were "counsel's medical issues and trial schedule"—not any delays caused by Petitioner himself.  (*See* 3 CT 347.)

Moreover, the record does not support Petitioner's assertion that the trial judge thought Mr. Levine purposefully was delaying trial.  Indeed, the judge acknowledged and assumed as true that the reasons Mr. Levine had offered for his requested delay were valid characterizations of Mr. Levine's "disappointing situation."  (2 RT B-16.)  The trial court acknowledged that Mr. Levine's child molestation cases took statutory priority over Petitioner's case, priority with which the trial court stated it was "not quarreling."  (2 RT B-17.)  The trial court acknowledged the seriousness of Mr. Levine's health condition, stating that Mr. Levine has "a chronic heart condition that causes [him] chest pains when [he is] in a stressful situation."  (2 RT B-15.)  In fact, the trial court noted that it was not suspicious of Mr. Levine's health restrictions (*see id.* ("I don't mean curious in a suspicious sense.")); stated that Mr. Levine's word was "as good as gold" (2 RT B-16); and complimented Mr. Levine regarding the declaration he submitted in support of his third Section 1050 motion, stating that Mr. Levine was "impeccable for [his] honesty" (*id.*).  The court stated at a later date that Mr. Levine "never made a frivolous motion . . . .  His, in good faith, was nevertheless a problem in terms of readiness."  (2 RT D-11.)  In short, the court's decision rested on Mr. Levine's representations, not on any invidious inference Petitioner asserts the trial court developed.

///

Based on the reasoning given by the trial court in the minutes, and in the context of the full reasoning given by the trial court at the hearing and reprinted *supra*, the Court cannot conclude that the decision to remove Mr. Levine fell so far outside the "trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar" as to render the Court of Appeal rejection of Petitioner's habeas claim objectively unreasonable. *Gonzalez-Lopez*, 548 U.S. at 152 (citations omitted).

> b. *Requiring Petitioner to Find Replacement Counsel in Ten Days, and Requiring Replacement Counsel to Be Prepared to Try the Case in Sixty Days*

Petitioner contends that the trial court deprived him of his right to counsel of choice "by giving Petitioner a mere 10 days to seek other counsel,[3] and then a mere 60 days for that counsel to be ready for a trial." (Petition MP&A at 37.) Petitioner argues that, due to the strict timeline, several attorneys he sought to retain declined to represent him, and he had to settle for representation from a family friend who was willing to commit to the trial court's timetable. (*Id.* at 37-38.) Respondent does not directly address this aspect of Petitioner's claim. (*See* Answer at 33-35.)

Petitioner did not present the trial court with a request or motion to allow further time to retain an attorney or to allow a prospective attorney to prepare for trial. In other words, Petitioner has not identified any denial of a request for continuance or for substitution of attorney after Mr. Levine's removal. Nor can he, as the record shows that the trial court allowed Petitioner to retain Mr. Haberer well

---

[3] Though Petitioner's brief repeatedly states that he was given *ten* days to retain counsel (*see, e.g.*, Petition MP&A at 28 (citing 2 RT B-43)), the trial court actually continued proceedings for *fourteen* days, until May 28, in order to "give [Petitioner] time and the P.D.s or whoever is going to represent you time to sort all of that out to be able to come back to [the] court and give [the court] something concrete." (2 RT B-43.)

after the deadline it purportedly imposed on Petitioner to retain a new attorney (*compare* 3 CT 481 (granting Mr. Haberer's substitution on July 16, 2014), *with* 2 RT B-43 (setting hearing for May 28, 2014, when the court expected "whoever [was] going to represent" Petitioner to "give [the court] something concrete")), and that the trial court gave Mr. Haberer more than sixty days after substitution, over ninety days after Mr. Haberer appeared in court to request to represent Petitioner, and over 120 days after the court initially imposed the sixty-day timetable to prepare for trial (*compare* 2 RT B-41 (declaring, on May 14, 2014, that any attorney representing Petitioner would need to "represent that they can take this case and be ready in 60 days"), 3 CT 479 (noting Mr. Haberer's request to substitute on June 25, 2014), *and* 3 CT 481 (granting Mr. Haberer's substitution on July 16, 2014), *with* 3 CT 485 (commencing trial on September 29, 2014)).

Further, the Court observes that Petitioner himself urged the expeditious resolution of his case, even at the potential expense of adequate representation. Upon Mr. Levine's removal from the case, Petitioner expressed to the trial court that he wanted the case "to be over," going so far as to threaten forcing a trial within three days by declining to waive his right to a speedy trial. (2 RT B-33 to -34.) As construed by the trial court, "Mr. Valerio stated clearly . . . that he really wanted his trial to come up as soon as possible." (2 RT B-37.) Accordingly, the trial court's imposition of the sixty-day timetable not only advanced the efficient administration of justice in this matter, but also effected Petitioner's express desire to complete the case as soon as possible.

Ultimately, what Petitioner argues is that he *effectively* was denied counsel of choice by the timetable initially prescribed by the trial court at the May 14 hearing. (*See* Petition MP&A at 37 (characterizing the court's timetable as constitutional error).) The Court of Appeal's decision of Petitioner's claim was not objectively unreasonable because Petitioner's argument is squarely foreclosed by *Gonzalez-Lopez*, in which the Supreme Court "recognized a trial court's wide latitude in

41

balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar," including "a court's power . . . to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." 548 U.S. at 152 (citations omitted); *accord Slappy*, 461 U.S. at 11-12 ("Trial judges necessarily require a great deal of latitude in scheduling trials. . . . Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." (citation and quotation marks omitted)).  Petitioner does not articulate a constitutional violation in asserting that the court's trial timetable made it so that he could not be "represented by the attorney he believed to be best for him."  (Petition MP&A at 37-38.)

Petitioner also contends that the trial court failed to weigh on the record the reasoning behind imposing the timetable, and argues that the trial judge's comments regarding his prior practice as an attorney amounted to an "arbitrary anecdote."  (Petition MP&A at 39.)  Contrary to Petitioner's assertions, the trial court's statements reveal its reasoning regarding the timetable imposed.  The court supported its scheduling decision by drawing upon the judge's prior litigation experience, noting that in his thirty years as a lawyer, the judge "had to prepare much more involved cases than this in a 60-day period." (2 RT B-41.)  The judge reiterated that the case was more than three years old.  (2 RT B-40.)  The judge also cited Petitioner's express desire to try the case as soon as possible, and noted that both Petitioner and Mr. Carney would be equipped to try the case within three days. (*See* 2 RT B-37, -41.)  In addition, the judge had opined earlier in the hearing that, although it had "a lot of witnesses," Petitioner's case was "not a very complicated case."  (2 RT B-11 to -12.)  In light of this stated reasoning, it cannot be said that the scheduling decision made at the May 14 hearing was unreasoning or arbitrary. *See Slappy*, 461 U.S. at 11-12.

Petitioner further argues that his trial was so "significantly complex" that the court's timetable was unreasonable. (Petition MP&A at 37; *see also id.* at 35 ("Petitioner's trial was a complex matter involving issues of 1101(b) evidence, insurance coverage issues, an arson investigation, cell phone records, numerous lay and expert witnesses, and a related civil case.").) But Petitioner does not convincingly articulate how a single-defendant arson and insurance fraud case, even with the volume of documents and witnesses involved, would require more than two months of preparation for a competent attorney. Petitioner rests his argument on Ms. Gilliam's statement that it was not "realistic" for the trial court to expect her to represent Petitioner and try the case in sixty days. (2 RT B-38; *see also* Petition MP&A at 38; Reply at 15-16.) But Ms. Gilliam's argument before the trial judge is not conclusive evidence, especially given that the trial judge expressly addressed and rejected her argument. (*See* 2 RT B-40 ("I don't agree with you [Ms. Gilliam] that no one can be ready for this case in a 60-day period.").) Beyond Ms. Gilliam's statement, Petitioner has not shown how his case was so complicated that no attorney could have been ready within sixty days. Indeed, Petitioner's position is undermined by his retention of Mr. Levine, who initially committed to try the case within sixty to ninety days after his retention (*see* 2 RT B-7), as well as by his retention of Mr. Haberer, who represented to the trial court that he would be able to assume representation and bring the case to trial within sixty days (*see* 2 RT D-4; 2 RT E-2). Thus, Petitioner's contention that the trial court unreasoningly and arbitrarily insisted upon expeditiousness in the face of a justifiable request for delay (*see* Reply at 14-15 (citing *Slappy*, 461 U.S. at 11-12)) is belied by the trial court's reasoning supporting the imposition of a strict timeline for the resolution of the case, the lack of support for his claim in the trial record, and the fact that Petitioner himself insisted upon the expeditious resolution of his case instead of requesting a delay.

///

Petitioner analogizes the circumstances of his case to *United States v. Yepiz*, 844 F.3d 1070 (9th Cir. 2016), in which a Ninth Circuit panel concluded that a trial court abused its discretion in ignoring a criminal defendant's letters requesting substitution of counsel. (Petition MP&A at 38-39.) Petitioner contends that, like ignoring the letters from the defendant in *Yepiz*, the trial court here ignored Ms. Gilliam's statements "that being ready for a trial . . . within 60 days was unreasonable." (*Id.* at 38.) Petitioner's reliance on *Yepiz* is unavailing. As Respondent correctly points out (Answer at 34-35), the *Yepiz* decision was withdrawn and replaced after the filing of the Petition. *United States v. Yepiz*, 718 F. App'x 456, 463 (9th Cir. 2017). In the amended opinion, the panel concluded that the trial court's denial of the motion was not an abuse of discretion and did not offend the defendant's right to counsel of choice. *Id.* at 468-69.

Thus, Petitioner has not shown the trial court's scheduling order violated his right to counsel of choice on the basis that he was unable to retain replacement counsel (other than Mr. Haberer). *See, e.g.*, *Karnes v. Premo*, 521 F. App'x 595, 597 (9th Cir. 2013) (right to counsel of choice not violated where trial court refused to grant continuance of trial, even though "[i]t [was] undisputed that private counsel . . . would not agree to represent [the defendant] unless a continuance of the trial were granted, a continuance the trial court clearly stated it would not countenance"). The Court of Appeal's rejection of this claim was not unreasonable.

### 4.   Summary

As Petitioner casts it, "[t]he trial court's rationale for removing Petitioner's counsel of choice and ordering Petitioner to find a new lawyer, or have one appointed that would be ready for trial within sixty days, was, in essence, that the [c]ourt believed its view of the efficient administration of justice trumped Petitioner's Sixth Amendment right to counsel of choice." (Petition MP&A at 35.) This is precisely what Supreme Court precedent acknowledges trial courts may do.

*See Gonzalez-Lopez*, 548 U.S. at 152.  The Court cannot conclude that the Court of Appeal's decision of Petitioner's claim was an objectively unreasonable application of clearly established federal law.  Petitioner is not entitled to federal habeas relief on Ground One of the Petition.

### B.     Ground Two

In Ground Two, Petitioner alleges that Mr. Haberer rendered constitutionally ineffective assistance of counsel.  Petitioner identifies three broad subclaims within this ground:  (1) Mr. Haberer failed to prepare adequately for trial; (2) Mr. Haberer failed to defend Petitioner competently at trial; and (3) the cumulative effect of Mr. Haberer's errors constitutes ineffective assistance and deprived Petitioner of a fundamentally fair trial.  (*See* Petition MP&A at 40-49.)  For the following reasons, AEDPA precludes relief on all three subclaims, so Ground Two must be denied.

### 1.     Legal Standards

#### a.     *Ineffective Assistance of Counsel*

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel."  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam); *see also Missouri v. Frye*, 566 U.S. 134, 138 (2012) ("The right to counsel is the right to effective assistance of counsel.").  To succeed on an ineffective assistance of counsel claim, a federal habeas petitioner must demonstrate:  (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An ineffective assistance claim may be denied if the petitioner fails to establish either prong of the *Strickland* test.  *See id.*; *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").  Review of counsel's effectiveness is "highly deferential," and in cases subject to the "deferential lens" of AEDPA, federal review is "doubly deferential."

45

*Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Strickland*, 466 U.S. at 689, and *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2, 123 (2009)).

A petitioner may establish deficient performance by showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and quotation marks omitted). Courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. The court may neither second-guess counsel's decisions or trial strategy "nor apply the fabled twenty-twenty vision of hindsight." *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009) (citation and quotation marks omitted); *accord Gentry*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). Petitioner must show an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

The prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000). A petitioner may establish prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 391. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *accord Strickland*, 466 U.S. at 693 ("It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding.").

46

### b.    *Cumulative Error*

"The cumulative error doctrine in habeas recognizes that, even if no single error were prejudicial, where there are several substantial errors, their cumulative effect may nevertheless be so prejudicial as to require reversal." *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (citation and quotation marks omitted); *accord Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011). Habeas relief for cumulative error is appropriate "when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra*, 656 F.3d at 1001 (quoting *Parle*, 505 F.3d at 933).

### 2.    Relevant Facts

### a.    *Preparation for Trial*

As described *supra* in Part V.A.2., at a June 25, 2014 hearing, Mr. Haberer appeared seeking to represent Petitioner for trial. (2 RT D-1 to -2.) The court hesitated to permit the substitution and told Mr. Haberer that he must be prepared to try the case within sixty days. (2 RT D-2.) Though Mr. Haberer stated he would be ready within sixty days, he expressed some reservations regarding commitments in other cases:

> I want to be as transparent about what I'm looking at, so that it
> doesn't in hindsight later on appear that I was perpetrating some
> deception on the court just wanting to come in on the case, because I
> can assure you I'm not being paid enough to do a case of this length so
> that I would desperately want to come in on a case like this.

(2 RT D-3.) Mr. Haberer recounted commitments he had in other cases. (2 RT D-3 to -4.) He then stated:

> I believe I can do this within 60 days. I don't believe I have
> anything significant coming in. I know there's been a lot of
> preparation done by previous attorneys. I've been privy to that

47

preparation. I've looked at it. I believe that shortens significantly the
work that I would have to otherwise do, because the preparation that I
saw wasn't just in the nature of attorneys having reviewed it, but as
extensive notes and trial notebooks that would allow me to—well,
familiar—they've laid the foundation and allow me, not necessarily to
turn-key into this case, but I think I could be acclimated to it quite
rapidly.

(2 RT D-5.) Mr. Haberer stated, "I've assessed the preparation necessary for this case, I've made an estimation of my degree of preparation and that [sic] was done before." (2 RT D-8.) The trial judge proposed that Mr. Haberer discuss his other commitments with the judges in those cases, and that he return later with a firm commitment that he would be prepared to try the case within sixty days. (2 RT D-6, -9.)

On July 16, 2014, Mr. Haberer committed to a trial date of September 26, 2014:

I will announce ready as far as preparedness and having looked
over the materials and also pending any issues of subpoenas and
witnesses and issues such as that. If there is a problem, I will call up
your judicial assistant and ask to advance the case; but I can represent
that I anticipate being ready on the 26th.

(2 RT E-2.) The court permitted the substitution of Mr. Haberer for Ms. Gilliam and scheduled trial to begin on September 26, 2014. (2 RT E-3.) The parties announced ready for trial on that date. (2 RT F-1 to -2.)

During the trial, outside the presence of the jury in a discussion regarding a discovery issue, Mr. Haberer stated that his investigator, Candace Les, interviewed witnesses, but she did not take notes or prepare reports from those interviews. (4 RT 1503.) When asked by the court why he would not have reports prepared for witness statements, Mr. Haberer responded:

48

I don't know. That's just not my province. I don't think I'm mandated to write down everything I said at all, and I just don't like to do that. I can tell you tactically I feel that sometimes they're miswritten and then if it's a favorable witness, I can imagine it would be committed to that. . . .

I don't have to tell [the prosecutor] what I'm going to ask. If I have a written report, I have to hand that over; but I don't have to give him my questions. But I'm not holding any secrets here; I'm just going to ask [Gordon Hansen] about the Porsche fire because he's a witness to that. . . . But I'm going to ask him about the Porsche fire, about his relationship with Sergio [Ramirez]. I talked to him for like three minutes outside. That's the first time I'd met him.

So, as far as Oswaldo [sic] Amparan, I've never met him— excuse me, I met him but just greeted him. I'm just going to ask him about, you know, what he saw, because I understand he was a witness there as far as the fire afterwards, and his investments, things I've never talked to him about nor do I have any reports about [sic].

(4 RT 1503, 1505.)


b.    *Lollis Testimony*

At the preliminary hearing, Scott Lollis, who was a salesperson at Globotech, testified that sales were up in 2009, and that he was making more on commission than he previously had, because the telecommunications side of the business was doing well. (1 CT 135-37; *see also* 3 RT 1014.) Also at the preliminary hearing, Mr. Ramirez testified that he told Mr. Lollis that Petitioner wanted to "get rid of" Mr. Lollis, and that "it was obvious" Mr. Lollis would join Mr. Ramirez's new company. (1 CT 177-79; *see also* 1 CT 107.) Mr. Ramirez also estimated the value of components in inventory to be approximately $800,000. (*See* 1 CT 162.)

49

At trial, the prosecution called Mr. Lollis to testify as a fact witness. (3 RT 1009.) Mr. Lollis testified that, in 2009, Petitioner was "pretty stressed," and that Petitioner or Globotech was being sued by the IRS for $500,000. (3 RT 1018.) Although Mr. Lollis noted that business was up because Globotech started selling telecommunications equipment, Globotech was facing financial challenges due to slow sales of electronic components in inventory. (3 RT 1019-20; *see also* 3 RT 1028 ("[Sales were] always just up and down. It was a mess.").) Mr. Lollis estimated that the inventory in mid-2009 was valued at approximately $180,000 to $220,000. (3 RT 1020-21.) Mr. Lollis summarized discussions he had with Petitioner regarding investors: "he was trying to pay them back, or he was concerned about getting them their money back." (3 RT 1024.) Petitioner told Mr. Lollis, "[I]f we don't pay [the investors] back, we can't get any future monies for investment. . . . . [Y]ou can't take their money and not pay them back and expect them to give you more." (3 RT 1025.) Mr. Lollis said he eventually left Globotech to work for Mr. Ramirez, and didn't continue to talk with Petitioner after leaving Globotech. (3 RT 1025-26, 1029.) Mr. Haberer declined to cross-examine Mr. Lollis. (3 RT 1032.)

In closing argument, Mr. Haberer addressed Mr. Lollis's testimony, noting that Mr. Lollis "didn't paint the picture as one of desperation," given the telecommunications sales. (5 RT 1885; *see also* 5 RT 1888.) Mr. Haberer reiterated that Globotech's "prospects looked pretty good," as supported by Mr. Lollis's testimony. (5 RT 1914-15.) Mr. Haberer highlighted the discrepancy between Mr. Lollis's estimation of the value of inventory with the insurance company's much higher valuation of $1.2 million. (*See* 5 RT 1890.) He discounted Mr. Lollis's estimation, noting that Mr. Lollis "wasn't actually privy to the acquisition side of the business[,] which would dictate what the stock was." (*Id.*)

///

1          c.    *Dixon Testimony*

2        Edward Dixon, a Technical Communications Manager for AT&T, testified

3    regarding the cell phone records of Arthur Herrera.[4]  (*See* 3 RT 978, 981.)  Mr.

4    Dixon authenticated and explained the records and testified regarding cell-site

5    location data recorded therein.  (*See generally* 3 RT 978-1009.)  Mr. Dixon testified

6    regarding specific line items in the records, which indicated that certain calls were

7    made or received within a particular terrestrial area.  (*See* 3 RT 997-1002.)  Mr.

8    Haberer declined to cross-examine Mr. Dixon.  (3 RT 1009.)

9        In closing argument, Mr. Haberer addressed calls between Mr. Herrera's

10    mobile device, which was located within the vicinity of Globotech near the time of

11    the fire, with Petitioner's.  (5 RT 1918-23.)  Mr. Haberer argued:

12            [W]e might just safely assume that Mr. Valerio's calls did not

13        actually appear to be suspicious, excepting, of course, these two calls

14        that went to this person we'll call Arthur Herrera, who was in that

15        Santa Clarita area. . . .

16            Now, again, so I say take a step back from all this . . . and ask

17        yourself, if it were the case that those calls could be pinpointed to

18        coming from the actual property of Globotech, okay, now, that means

19        something.  If it were the case that those calls were shown to be made

20        from the precise same spot at the times the alarms were deactivated

21        and at the time that they were rearmed, then that too would certainly be

22        ///

23

24    _____

25    [4] As argued by the defense, who Mr. Herrera was and whether he was involved with
     the fire are unanswered questions.  (See 5 RT 1920 ("We don't know who this
26    Arthur Herrera person is. . . . . That doesn't strike you as a little bit something
     missing here?").  The prosecution argued that an unidentified person used the phone
27    number registered to Mr. Herrera's account to communicate with Petitioner on the
     night of the fire.  (*See* 5 RT 1869-72.)  The cell phone records are not part of the
28    record before this Court.

                                    51

very suspicious. . . . I don't even think Mr. Carney's arguing that [the

cell records] mean[] anything more than speculation . . . .

(5 RT 1922.)

### d. *Uncalled Defense Witnesses*

Near the conclusion of the prosecution's case, Mr. Haberer indicated he would call three witnesses in the defense case: Gordon Hansen, Osbaldo Amparan, and Sergio Ramirez. (*See* 4 RT 1507.) After the prosecution rested, Mr. Haberer opined that "the defense case is [not] going to go very long," but he requested a few minutes "to corral all [his] witnesses," who were present in the courtroom. (4 RT 1524-25.) After a recess, Mr. Haberer told the trial court that "[n]o witnesses other than the defendant will be called." (4 RT 1525.) The court gave Mr. Haberer time to discuss this strategy with Petitioner, after which Petitioner confirmed on the record that he agreed with the strategy not to call any witnesses. (4 RT 1525-26.) Later, in a discussion regarding impeachment issues, Mr. Haberer offered to call Kimberley Kahl to testify. (4 RT 1534.) Ultimately, the only witness the defense called was Detective Michael Digby. (*See* 4 RT 1555.)

Petitioner has lodged declarations from three witnesses: Gordon Hansen, Osbaldo Amparan, and Kimberley Kahl. Mr. Hansen, a Globotech investor and a witness to a fire that destroyed Petitioner's car,[5] declares he "would have provided strong evidence that [Petitioner's] car was burned by a group of gang members," but he declines to state what testimony or documentary evidence he would have provided that would have shown this to be true. (ECF No. 1-3, Exhibit 5, at 97 ¶ 5.) He also declares he would have testified that Petitioner had returned 40

---

[5] As described in the Court of Appeal's factual summary in its decision of Petitioner's direct appeal, the prosecution introduced "evidence that someone had deliberately set fire to defendant's car in 2005 using gasoline and road flares, and that defendant submitted an insurance claim for the damages." (LD 5, at 8.)

percent of the principal Mr. Hansen had invested in Globotech and that he was not pressuring Petitioner to pay him back. (*Id.* at 96 ¶ 1.) Mr. Hansen also declares he thinks Mr. Ramirez orchestrated the arson, and that both Mr. Ramirez and Mr. Lollis were "shady" people. (*Id.* at 97-98 ¶¶ 6-9.) Mr. Amparan, another Globotech investor, declares he would have testified that he was not worried about getting his investment back and that he never pressured Petitioner to return the money he invested. (*Id.*, Exhibit 6, at 100 ¶ 2.) Mr. Amparan also declares that, after the fire, he personally witnessed pry marks on the roof near the skylight, which he concluded is "evidence of forced entry." (*Id.* at ¶ 4.) Mr. Amparan declares he "wouldn't be surprised a bit" if Mr. Ramirez arranged for the fire, though he does not "have any evidence [Mr. Ramirez] caused the arson." (*Id.* at 100-01 ¶ 6.) Mr. Amparan declares he was scheduled to deliver a large order of parts shortly after the date of the fire, so "[t]he timing of the arson, right before a big delivery," did not make sense to him. (*Id.* at 100-01 ¶¶ 5-7.) Ms. Kahl, Petitioner's ex-wife, declares that, given her observations during the divorce proceedings, she would have testified that Petitioner "was not suffering financially at all." (*Id.*, Exhibit 2, at 9-10 ¶¶ 3-4.) She declares it is her belief that it was not in Petitioner's character to commit the crime, that Mr. Ramirez arranged for the fire, and that Mr. Lollis testified untruthfully. (*See id.* at 10 ¶¶ 6-9.) She writes that she believes certain paperwork would rebut the prosecution evidence that Petitioner owed money to the IRS, but she doesn't know where such paperwork would be, and she suspects Mr. Ramirez stole it from Petitioner's garage. (*Id.* at 10 ¶ 5.)

e.     *Habeas Proceedings in State Court*

In a habeas petition before the California Court of Appeal, Petitioner argued that Mr. Haberer rendered ineffective assistance of counsel because he failed to competently prepare for trial and failed to competently defend Petitioner at trial. (LD 11, at 56-70.) Petitioner also argued that the cumulative effect of trial

53

counsel's errors deprived him of the effective assistance of counsel and a fundamentally fair trial. (*Id.* at 70-71.) The Court of Appeal denied the petition, opining as to this ground: "Petitioner . . . fails to present a prima facie case that counsel's representation fell below an objection standard of reasonableness and further fails to establish a prima facie case that but for the alleged errors, the outcome of his trial proceedings would have been different. (See *Strickland v. Washington* (1984) 466 U.S. 668, 689-691, 693-694; *Roe v. Flores-Ortega* (2000) 528 U.S. 470, 482.)" (LD 12, at 1.) Presented with this claim in a subsequent habeas petition (LD 13, at 53-65), the California Supreme Court denied the petition without comment. (ECF No. 1-3, Exhibit 11, at 120.)

### 3. Discussion

As a preliminary matter, the Court addresses Respondent's contention that Ground Two should be rejected as conclusory. (Answer at 36-37.) Respondent argues that Petitioner's claims should be denied because Petitioner failed to lodge a declaration or other evidence from Mr. Haberer regarding his performance before and at trial. (*Id.*) Petitioner responds that such evidence is not required to support an ineffective assistance claim, and that the Superior Court record provides proof enough of Mr. Haberer's ineffectiveness. (Reply at 17-19.)

The Court agrees with Petitioner to the extent Respondent contends that lodging a declaration or other evidence from Mr. Haberer regarding his trial strategy is a necessary component of an ineffective assistance claim. A declaration from Mr. Haberer certainly could provide evidence probative of his effectiveness, but the claim here may not be denied summarily for its absence. The authorities Respondent cites provide that a lack of evidence demonstrating ineffectiveness may support the denial of an ineffective assistance claim, not necessarily that an ineffective assistance claim must be supported by a declaration by the allegedly deficient counsel. *See Gentry v. Sinclair*, 705 F.3d 884, 900 (9th Cir. 2013)

(rejecting ineffective assistance claim where petitioner "had no evidence to indicate why the failure [of counsel] was unreasonable under the circumstances"); *Womack v. McDaniel*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting ineffective assistance claim where petitioner offered no evidence of counsel's offending behavior aside from petitioner's own self-serving statement); *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (rejecting claim that counsel's failure to request an evidentiary hearing was constitutionally ineffective where petitioner "failed to lay a foundation for [the] claim," such as by submitting "an affidavit from the lawyer to explain the lawyer's strategy" or "indicat[ing] what a hearing would have done to dent, let alone refute, the expert evidence"); *Gloss v. Soto*, No. CV 13-5134-PA (JPR), 2014 U.S. Dist. LEXIS 101462, at *39, 2014 WL 3704531, at *14 (C.D. Cal. Apr. 14, 2014) (rejecting ineffective assistance claim where the petitioner "never presented any evidence in support of this claim to the state courts"), *adopted*, 2014 U.S. Dist. LEXIS 101523, 2014 WL 3704537 (C.D. Cal. July 22, 2014).

Here, Petitioner cites specific excerpts from the record and other evidence in support of his ineffective assistance claim (*see generally* Petition MP&A at 41-48), so a broad denial of the claim as conclusory would be inappropriate. *Cf., e.g.*, *Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011) ("[Petitioner's] cursory and vague claim cannot support habeas relief."); *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations made "without reference to the record or any document" are insufficient to support habeas relief); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Accordingly, the Court does not reject Ground Two as conclusory and instead addresses Petitioner's subclaims.[6]

---

[6] As described *infra*, however, the Court accepts Respondent's argument to the extent Respondent contends that the record lacks support for Petitioner's characterization of Mr. Haberer's strategy, and that certain arguments and allegations within Petitioner's subclaims are conclusory or unsupported.

a.     *Failure to Prepare for Trial*

Petitioner contends that Mr. Haberer failed to conduct a reasonable investigation because he did not speak to any of the potential defense witnesses before the trial, rendering his preparation for the trial constitutionally inadequate. (Petition MP&A at 41-43.)  Petitioner argues that Mr. Haberer's failure to competently prepare for trial rendered the subsequent decision not to call any defense witnesses unreasonable.  (*See id.* at 43.)  Petitioner states that "Haberer offered no reasonable professional judgment to support his failure to conduct a thorough investigation and to interview the potential witnesses." (*Id.*)  Though Petitioner broadly alleges that Mr. Haberer "fail[ed] to conduct a thorough investigation," the only act or omission Petitioner identifies supporting this allegation is Mr. Haberer's failure to interview potential defense witnesses personally.  (*See* Petition MP&A at 43.)[7]  Respondent argues that the record before the Court contains statements from Mr. Haberer demonstrating his planned preparation for trial, and that Mr. Haberer reasonably could have made the tactical decision not to interview witnesses personally on the basis of his review of the work of Petitioner's prior counsel.  (*See* Answer at 40-42.)

As an initial note, the part of the record Petitioner cites for his assertion that Mr. Haberer did not personally interview any defense witnesses does not precisely support the assertion.  Mr. Haberer simply stated that he and his investigator did not generate reports from witness interviews.  (4 RT 1503.)  Mr. Haberer acknowledged that he did not personally speak with Gordon Hansen and Osbaldo Amparan before trial, but the record does not indicate whether he personally interviewed any other witnesses.  (*See* 4 RT 1505.)

///

---

[7] To the extent this subclaim is predicated on other acts or omissions by Mr. Haberer in his preparation for trial, Petitioner's broad allegation here is too conclusory to merit relief.  *Greenway*, 653 F.3d at 804; *James*, 24 F.3d at 26.

Even assuming Petitioner's factual allegation were true, Mr. Haberer's failure to conduct personal interviews with the witnesses does not render his investigation inadequate *per se*. The duty to investigate and prepare a defense "does not necessarily require that every conceivable witness be interviewed." *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). A claim of failure to interview a witness cannot establish ineffective assistance when the person's account otherwise is fairly known to defense counsel. *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

As stated on the record and by several witnesses in declarations Petitioner himself submitted, Mr. Haberer delegated at least some witness interviews to his investigator, Ms. Les. (*See* 4 RT 1503; ECF No. 1-3, Exhibit 2, at 11 ¶ 4; ECF No. 1-3, Exhibit 4, at 93 ¶ 8.) Petitioner offers no explanation why this delegation was an objectively unreasonable way to prepare for trial. The Court cannot assume baselessly that the substance of Ms. Les's interviews and Ms. Les's assessment of the witnesses' demeanors were not adequately communicated to Mr. Haberer. Petitioner does not provide evidence showing that delegating the interviews to Ms. Les was objectively unreasonable. *See, e.g.*, *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998) (where trial counsel had reviewed work of investigator who previously worked on the case, "[t]he fact that trial counsel did not personally interview each witness does not constitute ineffective assistance"); *Scott v. Runnels*, No. CV 05-7711 PSG(JC), 2011 U.S. Dist. LEXIS 70395, at *83, 2011 WL 2672276, at *26 (C.D. Cal. May 13, 2011) ("[E]ven if [counsel] had not personally interviewed such witnesses, this would not render him ineffective as the substance of their testimony was known to him by virtue of the investigator's interviews of them."), *adopted*, 2011 U.S. Dist. LEXIS 72375, 2011 WL 2582104 (C.D. Cal. June 28, 2011).

As Respondent points out (*see* Answer at 40-41), the record supports a reading that Mr. Haberer was prepared for trial despite not having conducted

57

interviews personally.  Before trial, Mr. Haberer expressed confidence that he could review the file and adequately represent Petitioner based on the work product generated by Mr. Levine and Ms. Gilliam:

> I believe [preparation done by Petitioner's previous attorneys] shortens significantly the work that I would have to otherwise do, because the preparation that I saw wasn't just in the nature of attorneys having reviewed it, but as extensive notes and trial notebooks that would allow me to—well, familiar—they've laid the foundation and allow me, not necessarily to turn-key into this case, but I think I could be acclimated to it quite rapidly.

(2 RT D-5.)  Mr. Haberer also represented to the trial court that, if he encountered a problem with respect to preparedness for trial beginning September 26, 2014, he would have alerted the court's judicial assistant.  (*See* 2 RT E-2.)  The record does not show that Mr. Haberer ever communicated to the court that he had such a problem or that he otherwise felt underprepared.  (*See* 2 RT F-2 (announcing ready for trial on September 26, 2014).)  During trial, Mr. Haberer demonstrated his knowledge of the case and the witnesses' potential testimony irrespective of conducting personal interviews with the witnesses.  Mr. Haberer expressed specifically that he wanted to call Gordon Hansen and Osbaldo Amparan, showing that he was aware of the potential defense witnesses and their prospective testimony to the extent that he could identify specific witnesses he sought to call and questions he would ask them.  (*See* 4 RT 1504-05.)  Petitioner argues in the Reply that this interpretation of Mr. Haberer's statements is "far-fetched."  (Reply at 21.)  But Petitioner bears the burden of proof here.  *See Strickland*, 466 U.S. at 688 ("[T]he [petitioner] must show that counsel's representation fell below an objective standard of reasonableness.").  Though Petitioner's reading of the record is plausible, the record is susceptible to a valid reading that Mr. Haberer adequately prepared for trial despite not personally interviewing witnesses.  Accordingly, the

58

Court defers to the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

In short, the Court cannot conclude that Mr. Haberer rendered deficient performance by not personally interviewing potential defense witnesses. *See Eggleston*, 798 F.2d at 376 ("A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." (citation and quotation marks omitted)); *see also, e.g.*, *United States v. Gooch*, 420 F. App'x 700, 701 (9th Cir. 2011) (rejecting ineffective assistance claim for failure to interview a witness because counsel became aware of witness's account by reviewing record); *Ray v. Cate*, No. C 11-1604 YGR (PR), 2014 U.S. Dist. LEXIS 106770, at *99, 2014 WL 3841214, at *32 (N.D. Cal. Aug. 4, 2014) (same).

To the extent Petitioner contends that the failure of Ms. Les and Mr. Haberer to generate reports of such interviews was objectively unreasonable (*see* Petition MP&A at 41), the argument lacks merit. Mr. Haberer stated on the record his tactical rationale for not generating such reports: "I can tell you tactically I feel that sometimes they're miswritten and then if it's a favorable witness, I can imagine it would be committed to that." (4 RT 1503.) Petitioner provides no argument why that tactical decision is objectively unreasonable, or why creating such interview reports would have had a reasonable probability of changing the outcome of the trial. *See Strickland*, 466 U.S. at 688, 693; *see also, e.g.*, *Keene v. Martell*, No. ED CV 09-126-JST(E), 2011 U.S. Dist. LEXIS 65128, at *76-77, 2011 WL 2437505, at *27 (C.D. Cal. Feb. 10, 2011) (rejecting ineffective assistance claim where petitioner "assert[ed] that constitutionally adequate performance necessarily requires memorialization of witness interviews and statements"), *adopted*, 2011 U.S. Dist. LEXIS 65127, 2011 WL 2436942 (C.D. Cal. June 14, 2011).

///

///

Petitioner has not established that Mr. Haberer's performance fell below an objective standard of reasonableness on the basis that he did not personally interview witnesses. The subclaim does not merit habeas relief.[8]

### b. *Failure to Defend at Trial*

Petitioner asserts that Mr. Haberer rendered deficient performance by failing to competently defend Petitioner at trial. The Court divides its analysis of this subclaim based on Petitioner's three main arguments: (1) Mr. Haberer erred in declining to cross-examine Mr. Lollis; (2) Mr. Haberer erred in declining to cross-examine Mr. Dixon; and (3) Mr. Haberer erred in declining to call witnesses, specifically Mr. Hansen, Mr. Amparan, and Ms. Kahl. (*See* Petition MP&A at 43-49.)

### i. Failure to Cross-Examine Scott Lollis

Petitioner contends that Mr. Haberer's decision not to cross-examine Mr. Lollis was objectively unreasonable because cross-examination would result in testimony favorable to Petitioner: (1) testimony regarding Petitioner's plan to fire Mr. Lollis before Mr. Lollis quit would demonstrate bias against Petitioner; (2) Mr. Lollis's preliminary hearing testimony regarding sales contradicted his trial testimony, and pointing out the discrepancies would undermine his credibility; and

---

[8] Petitioner does not address the prejudice inquiry in the Petition (*see* Petition MP&A at 41-43), so the subclaim independently is rejected for failure to prove *Strickland* prejudice. *See Strickland*, 466 U.S. at 693 (stating "general requirement that the defendant affirmatively prove prejudice"). As discussed in further detail *infra*, Petitioner has not established a reasonable probability that the result of the trial would have been different if the three witnesses he identifies had been called by the defense to testify. Accordingly, to the extent Petitioner implicitly contends that counsel's decision not to call defense witnesses was a product of his failure to interview them or to prepare adequately for trial, the subclaim still fails on the prejudice prong.

(3) Mr. Lollis's estimation of the value of components in inventory would be revealed to be unsubstantiated, which would undermine his credibility. (Petition MP&A at 44-45.) Respondent contends Mr. Haberer's decision not to cross-examine could have been a reasonable tactical decision, especially given Mr. Haberer's reliance on certain aspects of Mr. Lollis's testimony in his closing argument. (Answer at 44-46.)

"[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must . . . meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000); *see also Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980) ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation.").

The three lines of questioning Petitioner proposes Mr. Haberer should have pursued fail to show that Mr. Haberer's tactical decision not to cross-examine Mr. Lollis was objectively unreasonable.

Petitioner contends that Mr. Haberer should have called Mr. Lollis's credibility into question by eliciting the fact that Petitioner intended to terminate Mr. Lollis's employment before Mr. Lollis voluntarily quit. (Petition MP&A at 44.) Respondent argues that Mr. Haberer "could have made the tactical decision not to cross-examine [Mr.] Lollis because counsel reasonably believed that nothing in his direct examination testimony was so detrimental to Petitioner's defense, as suggested by counsel's statements about [Mr.] Lollis in his closing argument." (Answer at 44; *see also id.* at 43-46.)

Mr. Lollis had testified in direct examination that he left Globotech to work for Petitioner's former business partner, Mr. Ramirez. (3 RT 1025-26.) Petitioner contends that introducing testimony showing that Petitioner was going to fire Mr. Lollis would "demonstrate to the jury that [Mr. Lollis's] parting from Globotech and Petitioner was not amicable and Lollis had bias against Petitioner." (*Id.*) But

this testimony would have presented a risk: examining Mr. Lollis regarding
Petitioner's intent to terminate his employment could have introduced a fact
negatively impacting the jury's perception of Petitioner's character.  In any event,
Petitioner does not show how it was objectively unreasonable not to elicit testimony
to show that Mr. Lollis was a biased witness.  Indeed, Mr. Haberer cited Mr.
Lollis's testimony in arguing to the jury that Petitioner was not under financial
pressure and that the Globotech business was doing well.  (*See, e.g.*, 5 RT 1884-85,
1887-88.)  Petitioner does not show that working with Mr. Lollis's testimony
instead of cross-examining him to establish his bias against Petitioner was an
objectively unreasonable tactical decision.

Petitioner avers that Mr. Haberer could have impeached Mr. Lollis on the
basis of contradictions between his trial and preliminary hearing testimony with
respect to Globotech sales.  (Petition MP&A at 44-45.)  Petitioner avers that Mr.
Lollis's preliminary hearing admission that the business was doing well conflicts
with his trial testimony that the company was facing financial challenges due to
slow sales of electronic components.  (*Id.*)  It does not.  Mr. Lollis consistently
testified that, although the telecommunications side of the Globotech business was
selling well, the components side of the business was faltering.  (*Compare* 1 CT
135-37, *with* 3 RT 1019-20.)  There was no contradictory testimony for Mr.
Haberer to elicit.  To the extent Mr. Lollis's testimony highlighted the disparity in
sales between the telecommunications and components ends of the business, Mr.
Haberer reasonably could have elected to address the disparity in his closing
argument instead of in cross-examination.  Indeed, as Respondent points out (*see*
Answer at 44-46), Mr. Haberer noted in closing that Mr. Lollis "didn't paint the
picture as one of desperation," as Globotech's "prospects looked pretty good"
despite the lagging sales of components.  (5 RT 1885, 1914-15.)  Petitioner argues
in the Reply that "argument from counsel cannot be substituted for vigorous cross-
examination that would have revealed Lollis' contradictory statements and lack of

foundation for his claims."  (Reply at 23 (citing Petition MP&A at 44-45).)

Petitioner cites his own brief, but no authority, for this proposition.  Petitioner does not explain why challenging Mr. Lollis's estimation through argument instead of examination amounted to constitutionally deficient representation.  *Cf., e.g.*, *Perry v. New Hampshire*, 565 U.S. 228, 246 (2012) (noting that defense counsel "can . . . focus the jury's attention on the fallibility of [eyewitness] testimony during opening and closing arguments"); *Range v. Schomig*, 351 F. App'x 222, 223 (9th Cir. 2009) (rejecting ineffective assistance claim predicated on failure to cross-examine a witness regarding inconsistent testimony because "counsel thoroughly developed these inconsistencies through cross-examination of other witnesses and in closing argument").

Finally, Petitioner contends that Mr. Lollis's estimate of the value of the inventory, $180,000 to $220,000, was baseless.  (Petition MP&A at 45.)  As Respondent identifies (*see* Answer at 45-46), Mr. Haberer questioned the accuracy of Mr. Lollis's estimation in his closing argument.  (5 RT 1890 ("Scott Lollis wasn't actually privy to the acquisition side of the business[,] which would dictate what the stock was.").)  Petitioner does not show how counsel's tactical decision to discount Mr. Lollis's estimate in closing argument instead of in cross-examination was objectively unreasonable.

As to the prejudice prong of *Strickland*, Petitioner does not show that, but for Mr. Haberer's decision not to cross-examine Mr. Lollis, a more favorable trial result was substantially likely.  Petitioner argues that Mr. Lollis's testimony helped the prosecution establish motive to commit the arson and insurance fraud.  (Petition MP&A at 44.)  But even adopting Petitioner's assumption that an able attorney would have discredited Mr. Lollis's testimony, the prosecution presented other credible evidence of criminal motive.  For example, Petitioner's insurance claim deposition transcript was introduced into evidence, wherein Petitioner stated under oath that he felt "pressure" to return money to his investors.  (4 RT 1295.)  An

insurance agent testified that Petitioner took out an insurance policy on the inventory shortly before the incident, and that he sought a policy for an amount higher than his inventory was worth, from which the jury could infer that Petitioner stood to benefit from the destruction of the inventory. (*See* 3 RT 917-18.) Given the weight of other evidence of Petitioner's motive, Petitioner does not affirmatively prove that, but for the decision not to cross-examine and discredit Mr. Lollis, there is a substantial likelihood that the jury's consideration of motive would have been different. *See Strickland*, 466 U.S. at 693.

The Court cannot conclude that failing to cross-examine Mr. Lollis fell below an objectively reasonable level of representation, nor can the Court determine that the lack of cross-examination was prejudicial.

ii.     Failure to Cross-Examine Edward Dixon

Petitioner argues that Mr. Haberer should have cross-examined Mr. Dixon "to establish the lack of accuracy and scientific credibility of [cell-site location] evidence and to challenge the testimony's and witness's credibility on the subject." (Petition MP&A at 45.) Petitioner cites an internet article[9] he lodges as an exhibit in support of his assertion that "cell-tower tracking evidence is unreliable and often referred to as 'junk science.'" (*Id.*; *see also* ECF No. 1-3, Exhibit 9, at 108-10.) Respondent contends that Mr. Haberer reasonably could have believed that challenging Mr. Dixon on the issue would be futile given the weight of authority supporting the admission of such tracking evidence. (Answer at 43.)

As described in Petitioner's article:

Such testimony usually goes unchallenged, presumably because most
defense lawyers either accept at face value prosecutors' assurances that

---

[9] Mark Hansen, *Prosecutors' use of mobile phone tracking is 'junk science,' critics say*, ABA J. (June 1, 2013), http://www.abajournal.com/magazine/article/prosecutors_use_of_mobile_phone_tracking_is_junk_science_critics_say.

cell tower evidence is scientific or because they don't know enough
about the underlying technology to understand its limitations.  And, on
the few occasions that it has been challenged, the courts have always
let it in.

(ECF No. 1-3, Exhibit 9, at 108.)  This passage undermines Petitioner's claim in its

observation that most lawyers do not challenge the veracity of cell-tower tracking

evidence and that most judges admit such evidence.  Indeed, California courts have

concluded that "the cell tower tracking technique ha[s] been widely accepted and

admitted into evidence in courts throughout the nation."  *People v. Thomas*, No.

H039990, 2015 Cal. App. Unpub. LEXIS 3156, at *11, 2015 WL 2105729, at *4

(Cal. Ct. App. May 5, 2015) (collecting cases); *see also, e.g.*, *id.*, 2015 Cal. App.

Unpub. LEXIS 3156, at *11-12, 2015 WL 2105729, at *4 ("Since a reasonably

competent attorney would have concluded that a challenge to the cell tower

tracking evidence . . . was futile, defendant has failed to show that trial counsel's

performance was deficient."); *People v. Garlinger*, 247 Cal. App. 4th 1185, 1196

(2016) (citing cases for the proposition that cell-site location testimony "is routinely

admitted in the trial courts of this state").

Effectively, Petitioner requests that this Court hold that it was *per se*

objectively unreasonable to have declined to question cell-tower tracking evidence

at the time of Petitioner's trial.  (*See* Petition MP&A at 45.)  The Court declines to

do so.  *See, e.g.*, *Williams v. Gastelo*, No. CV 18-2455 AB (SS), 2019 U.S. Dist.

LEXIS 151574, at *33-38, 2019 WL 4229690, at *13 (C.D. Cal. July 30, 2019)

(rejecting ineffective assistance claim predicated on counsel's failure to object to

testimony of custodian of records of cell service company regarding cell-tower

location evidence), *adopted*, 2019 U.S. Dist. LEXIS 151573, 2019 WL 4221388

(C.D. Cal. Sept. 4, 2019); *Thomas v. Santoro*, No. 16-cv-05646-BLF, 2018 U.S.

Dist. LEXIS 203504, at *23-24, 2018 WL 6270955, at *8 (N.D. Cal. Nov. 30,

2018) (reviewing Court of Appeal decision in *People v. Thomas*, 2015 Cal. App.

Unpub. LEXIS 3156, 2015 WL 2105729, and reasoning that "[t]hough [the p]etitioner has successfully pointed to a few criticisms of cell-tower technology at the relevant time, this evidence is not sufficient to overcome the weight of case authority relied upon by the state appellate court for its determination that cell-tower tracking methodologies were 'widely accepted' in the scientific community"); *Pulido v. Grounds*, No. 2:13-cv-01814 TLN GGH, 2015 U.S. Dist. LEXIS 141313, at *51, 2015 WL 6123616, at *17 (E.D. Cal. Oct. 16, 2015) ("[T]he vast amount of case authority, even recent authority, both within and without California, could not place reasonable counsel on notice of a deficient advocacy if they did not vigorously seek to keep out [cell-site location] evidence.").

In any event, Mr. Haberer questioned the accuracy and efficacy of the cell phone records in his closing argument. He noted that the records do not place Mr. Herrera precisely in the area of Globotech at the time the fire ignited, and that the fact that Petitioner's phone connected with Mr. Herrera's does not establish anything with respect to his supposed orchestration of the fire. (*See* 5 RT 1922.) Petitioner does not show why casting doubt on the cell-tower tracking evidence in closing argument rather than in cross-examination of Mr. Dixon was objectively unreasonable. *See Strickland*, 466 U.S. at 689.

Nor does he show he was prejudiced by Mr. Haberer's strategy given that the jury heard in argument the defense theory that the tracking information did not demonstrate that Petitioner orchestrated the fire. Moreover, the cell location testimony was but one component of the circumstantial evidence connecting Petitioner to the crime. For example, the fact that Petitioner's code was used to deactivate and reactivate the alarm shortly before the fire broke out provided additional evidence that Petitioner was involved with the fire. (*See* 4 RT 1225-26.) Petitioner does not show there was a reasonable probability that, if Mr. Dixon's testimony were discredited or the cell phone location evidence were not admitted, ///

the result of trial would have been different.  *See Pinholster*, 563 U.S. at 189-90; *Strickland*, 466 U.S. at 694.

The Court cannot conclude that Mr. Haberer was ineffective in declining to challenge Mr. Dixon's testimony.

       iii.  Failure to Call Gordon Hansen, Osbaldo Amparan, and Kimberley Kahl

Petitioner contends that Mr. Haberer's decision not to call any defense witnesses was constitutionally deficient.  (*See* Petition MP&A at 45-48.)  Petitioner avers that, in light of the proposed testimony in the declarations of Mr. Hansen, Mr. Amparan, and Ms. Kahl, there is a reasonable probability that the outcome of trial would have been different had the witnesses testified "[g]iven . . . Haberer's theory of the case—that the investors were not pressuring Petitioner to repay them—and given that the jury needed to believe someone else committed the arson to acquit Petitioner."  (Petition MP&A at 48.)  Respondent asserts that the record shows that Mr. Haberer made a strategic decision not to call these witnesses, and that such a strategic decision is "virtually unchallengeable."  (Answer at 51 (quoting *Strickland*, 466 U.S. at 690); *see also id.* at 46-54.)

The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial."  *Taylor v. Illinois*, 484 U.S. 400, 418 (1988); *see also Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.").  The failure to call a witness cannot establish ineffective assistance when defense counsel is informed of the facts and circumstances of the witness's account.  *See Eggleston*, 798 F.2d at 376.  Trial counsel's tactical decisions deserve deference when counsel makes an informed decision based on strategic trial considerations, and the decision appears reasonable under the circumstances.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices

made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); *Dows*, 211 F.3d at 487 (9th Cir. 2000) ("[C]ounsel's tactical decisions at trial . . . are given great deference . . . .").

Petitioner does not offer any argument successfully rebutting the "strong presumption" that Mr. Haberer's decision not to call defense witnesses was within the wide range of reasonable representation. *Strickland*, 466 U.S. at 689. Petitioner asserts without evidentiary support that Mr. Haberer's decision "was not based on any trial tactics or strategy," but rather "was the result of his lack of preparation of the case." (Petition MP&A at 46.) As discussed *supra* in Part V.B.3.a., Petitioner fails to show that Mr. Haberer's preparation for trial was inadequate. Nothing before this Court elucidates what transpired in the recess after the prosecution rested, or what was discussed *sotto voce* between Mr. Haberer and Petitioner, but the record shows that Mr. Haberer's decision not to call witnesses was a strategic one. (*See* 4 RT 1524-25.) Petitioner even confirmed his agreement with Mr. Haberer's strategy in open court. (4 RT 1526.) Even though the record does not expressly reveal the contours of Mr. Haberer's strategy, Petitioner does not meet his burden to show that Mr. Haberer's strategy was unsound. As Respondent identifies, Mr. Haberer could have concluded that calling witnesses to testify was unnecessary "because counsel reasonably believed that the prosecution had failed to meet its burden of proof beyond a reasonable doubt." (Answer at 52.) In fact, Mr. Haberer in his closing argument noted that the defense did not introduce much evidence, emphasizing that the defense "did not take on the burden of proof," and that the defendant "contend[ed] that [the government] didn't even come close to proving guilt beyond a reasonable doubt." (5 RT 1883; *see also* 5 RT 1925-28.) Indeed, there are myriad reasons why Mr. Haberer could have decided not to call witnesses that are consistent with an objectively sound trial strategy.

The witnesses state in their declarations that they would have testified that Petitioner was not under financial pressure. (ECF No. 1-3, Exhibit 2, at 9 ¶ 3, 10

¶ 5; *id.*, Exhibit 5, at 96 ¶ 1; *id.*, Exhibit 6, at 100 ¶ 2.)  Respondent argues that trial counsel reasonably could have made the decision not to present this evidence had counsel "believed that the prosecution had failed to show that Petitioner was facing extreme financial difficulties, including problems with investors of Globotech Industries."  (Answer at 52; *see also id.* at 52-53.)  Before the jury, Mr. Haberer argued, "there's no evidence that there was extreme pressure on [Petitioner] to pay [his investors] back."  (5 RT 1917.)  Petitioner does not demonstrate that highlighting in argument the lack of evidence of financial pressure instead of eliciting witness testimony on the issue was objectively unreasonable.

Mr. Amparan would have provided testimony that he observed signs of forced entry from the rooftop of the building.  (ECF No. 1-3, Exhibit 6, at 100 ¶ 4.)  Mr. Haberer examined Detective Digby regarding this theory and reiterated the theory in his closing argument.  (*See, e.g.*, 4 RT 1555-62; 5 RT 1900-01.)  Petitioner does not identify why presenting this theory to the jury using this strategy was objectively unreasonable.

Both Mr. Hansen and Ms. Kahl would have provided testimony that Mr. Lollis was biased or gave false testimony.  (ECF No. 1-3, Exhibit 2, at 10 ¶ 6, 12 ¶ 18; *id.*, Exhibit 5, at 98 ¶ 9.)  As described *supra* in Part V.B.3.b.i., Petitioner has not shown that declining to impeach or call into question Mr. Lollis's testimony was an unsound strategy.  Accordingly, Petitioner does not show that declining to introduce witnesses who would cast doubt on Mr. Lollis's testimony was objectively unreasonable to the extent Mr. Haberer reasonably chose not to discredit Mr. Lollis.

All three witnesses would have offered testimony that they thought Mr. Ramirez had coordinated the Globotech fire.  (*See* ECF No. 1-3, Exhibit 2, at 10 ¶ 9; *id.*, Exhibit 5, at 97-98 ¶¶ 7-8; *see id.*, Exhibit 6, at 101 ¶ 6.)  Petitioner argues that the witnesses' testimony could have cast suspicion on Mr. Ramirez, generating a reasonable doubt with respect to Petitioner.  (*See* Petition MP&A at 48; *see also*

Reply at 26 ("[T]he jury needed to hear testimony . . . that someone other than Petitioner had a motive to commit the arson.").) Respondent asserts that Mr. Haberer reasonably could have believed that it would not have been productive to the defense to place the blame on Mr. Ramirez because the witnesses' "beliefs were apparently based only on speculation and their personal negative opinions about [Mr.] Ramirez." (Answer at 53.) Indeed, the witnesses' statements do not provide much more than their impressions of Mr. Ramirez's character and vague, unsubstantiated references to his criminal connections. (*See, e.g.*, ECF No. 1-3, Exhibit 2, at 9 ¶ 2 (describing Mr. Ramirez as "a mean, vindictive person"); *id.*, Exhibit 5, at 97 ¶ 8 (stating Mr. Ramirez "knows 'certain people' who would help him commit the arson," and describing Mr. Ramirez as "a 'shady' person"); *id.*, Exhibit 6, at 100 ¶ 6 (describing Mr. Ramirez as "shady" and "vindictive").) Though each suggests Mr. Ramirez could have arranged the fire as an act of vengeance for the souring of his partnership with Petitioner (*see id.*, Exhibit 2, at 9 ¶ 2, 10 ¶ 9; *id.*, Exhibit 5, at 97-98 ¶¶ 7-8; *id.* Exhibit 6, at 100-101 ¶ 6), none provides credible evidence directly linking Mr. Ramirez with the fire. (*See, e.g.*, *id.*, Exhibit 6, at 100 ¶ 6 ("I don't have any evidence that Sergio caused the arson, but I wouldn't be surprised a bit.").) Moreover, Petitioner does not show that an objectively reasonable defense *required* Mr. Haberer to pursue a theory that Mr. Ramirez was the culprit. In closing argument, Mr. Haberer emphasized that the defense did not bear the burden of proof (*see* 5 RT 1881, 1883-84, 1920, 1925-28), and argued that the prosecution failed to establish beyond a reasonable doubt that Petitioner orchestrated the Globotech fire: "We don't really know what actually happened here, who was there, who actually even did this. That's reasonable doubt right there." (5 RT 1881-82.) Given that Petitioner did not need to prove that someone else was the culprit, Petitioner does not show that this strategy was objectively unreasonable. Nor does he articulate why pointing a finger at Mr. Ramirez on the basis of witnesses' negative impressions of his character and no

70

additional evidence was a reasonable strategy, let alone a strategy Mr. Haberer was compelled to adopt. *See Gustave*, 627 F.2d at 904 ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation.").

Petitioner also fails to establish prejudice. To establish prejudice caused by the failure to call a witness, Petitioner must show the witness was likely to have testified if called, the witness would have given the proffered testimony, and the witness's testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to Petitioner. *See Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003). Even if Mr. Hansen, Mr. Amparan, and Ms. Kahl had introduced the testimony in their declarations at trial, Petitioner does not show that their testimony would have had a substantial likelihood of changing the outcome because the jury already was presented with evidence and argument probative of the defense theories that Petitioner was not under financial pressure and that the rooftop entry was forced open. Moreover, Petitioner does not articulate why the jury would have credited the witnesses' testimony regarding their unsubstantiated concerns with Mr. Lollis's honesty over Mr. Lollis's trial testimony, or why the jury would have believed the witnesses' unsubstantiated suspicions that Mr. Ramirez was the true wrongdoer given the lack of other available evidence incriminating Mr. Ramirez. In other words, Petitioner does not establish why the jury would believe Mr. Hansen, Mr. Amparan, and Ms. Kahl over the other evidence presented at trial implicating Petitioner. *See Greenway v. Ryan*, 856 F.3d 676, 681 (9th Cir. 2017) ("We are asked to assume that the jury would have credited the exculpatory version, rather than the other versions, which inculpated [the petitioner]. There is no basis for such an assumption.").

Petitioner has not shown that Mr. Haberer rendered ineffective assistance by deciding not to call Mr. Hansen, Mr. Amparan, and Ms. Kahl.

///

///

71

1                    c.    *Cumulative Error*

2          Petitioner claims that the cumulative effect of Mr. Haberer's failure to

3   competently prepare for trial and failure to adequately defend at trial mandates

4   habeas relief.  (Petition MP&A at 49.)

5          Prejudice under *Strickland* may result from the cumulative impact of multiple

6   deficiencies.  "When an attorney has made a series of errors that prevents the proper

7   presentation of a defense, it is appropriate to consider the cumulative impact of the

8   errors in assessing prejudice."  *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir.

9   1998); *see also Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("[P]rejudice

10  may result from the cumulative impact of multiple deficiencies." (citation and

11  quotation marks omitted)); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438-

12  39 (9th Cir. 1995) (observing that cumulative prejudice may obviate the need to

13  analyze individual prejudicial effect of each of defense counsel's errors).  Here,

14  however, the Court has not found any instances in which trial counsel performed

15  deficiently under *Strickland*.  Nor does the Court find that the prejudicial impact of

16  Petitioner's allegations of attorney error, when considered together, undermines the

17  Court's confidence in the verdict.  *See Strickland*, 466 U.S. at 694.

18         To the extent Petitioner contends that the cumulative effect of Mr. Haberer's

19  errors rendered his trial fundamentally unfair (*see* Petition MP&A at 49), because

20  Petitioner has not shown any error with respect to Mr. Haberer's trial preparation

21  and performance, he cannot demonstrate any "unique symmetry of otherwise

22  harmless errors" meriting federal habeas relief.  *See, e.g.*, *Fairbank v. Ayers*, 650

23  F.3d 1243, 1257 (9th Cir. 2011) ("[B]ecause we hold that none of [the petitioner's]

24  claims rise to the level of constitutional error, there is nothing to accumulate to a

25  level of a constitutional violation." (citation and quotation marks omitted)); *Hayes

26  v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of

27  constitutional magnitude occurred, no cumulative prejudice is possible.").

28         The cumulative error subclaim does not provide a basis for relief.

1          4.     Summary

2          Petitioner has not established that Mr. Haberer performed deficiently or that

3  Mr. Haberer's deficient performance prejudiced the defense.  Accordingly, the state

4  court's rejection of Petitioner's ineffective assistance of counsel claim was not

5  contrary to, or an unreasonable application of, clearly established federal law.

6  Petitioner is not entitled to federal habeas relief on Ground Two of the Petition.

7

8     **C.     Ground Three**

9          In Ground Three, Petitioner argues that habeas relief is appropriate because

10  new evidence shows he is actually innocent of the crimes for which he was

11  convicted.  (Petition MP&A at 49-50.)

12          The Court first addresses Respondent's argument that the claim is barred by

13  the nonretroactivity doctrine set forth in *Teague v. Lane*, 489 U.S. 288, 310 (1989).

14  (Answer at 66-68.)  In *Teague*, the Supreme Court held that a new constitutional

15  rule of criminal procedure announced after a defendant's conviction becomes final

16  cannot be applied retroactively on federal habeas review unless the new rule forbids

17  criminal punishment of primary individual conduct or is a watershed rule of

18  criminal procedure.  *Teague*, 489 U.S. at 310-12.  Because Respondent argues that

19  the *Teague* bar applies, the Court must decide at the outset whether *Teague* is

20  implicated.  *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994).

21          The Court rejects this argument.  *Teague* applies only to procedural rules;

22  substantive rules are not subject to its retroactivity bar.  *See Montgomery v.*

23  *Louisiana*, 136 S. Ct. 718, 728 (2016); *Schriro v. Summerlin*, 542 U.S. 348, 351-52,

24  352 n.4 (2004).  Ground Three presents a substantive claim of actual innocence, so

25  it is not barred by *Teague*.  *See, e.g.*, *Magdaleno v. Baughman*, No. CV 17-08865

26  DSF (SHK), 2019 U.S. Dist. LEXIS 116578, at *23 n.3, 2019 WL 3069178, at *7

27  n.3 (C.D. Cal. May 15, 2019) (rejecting argument that freestanding actual

28  innocence claim is barred by *Teague*), *adopted*, 2019 U.S Dist. LEXIS 116575,

73

2019 WL 3067581 (C.D. Cal. July 10, 2019); *Butler v. Vasquez*, No. CV 16-5931-JEM, 2018 U.S. Dist. LEXIS 85074, at *12-13, 2018 WL 2315959, at *5 (C.D. Cal. May 21, 2018) (same); *Barnes v. Martel*, No. CV 17-1692 RSWL (RAO), 2018 U.S. Dist. LEXIS 60880, at *37, 2018 WL 1747781, at *13 (C.D. Cal. Feb. 2, 2018) (same), *adopted sub. nom. Barnes v. Paramo*, 2018 U.S. Dist. LEXIS 60933, 2018 WL 1750549 (C.D. Cal. Apr. 9, 2018).

Respondent further argues that Ground Three fails because there is no clearly established Supreme Court precedent, the claim is not cognizable, and the new evidence is insufficient to support a claim of actual innocence. (Answer at 68-73.) The Court agrees. The United States Supreme Court has not recognized that actual innocence claims are cognizable in noncapital habeas cases, so the California courts' decision of this claim cannot have been an unreasonable application of clearly established federal law. Assuming such a claim were cognizable, Petitioner's new evidence does not present an extraordinary and truly persuasive showing that he probably is innocent.

## 1.    Legal Standard

The Supreme Court has not decided whether federal habeas relief may be granted based on a freestanding claim of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *see also Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether such a federal right exists is an open question."). "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

The Ninth Circuit also "ha[s] not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although [it has] assumed that such a claim is viable." *Jones v.*

74

*Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014). If such a claim is cognizable, the petitioner must go beyond demonstrating doubt about his guilt and must prove affirmatively that he is probably innocent. *Id.* Such relief would be appropriate only upon an "extraordinarily high" and "truly persuasive" showing. *Herrera v. Collins*, 506 U.S. at 417. A petitioner may prevail only by demonstrating that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *Jones*, 763 F.3d at 1247 (citing *House v. Bell*, 547 U.S. 518, 537 (2006)). "The federal habeas court 'must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" *Id.* (quoting *House*, 547 U.S. at 538). After considering the evidence, the Court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

2.     Relevant Facts

On April 29, 2015, David Mascaro was deposed under oath in a civil case related to the fire. (*See generally* ECF No. 1-3, Exhibit 3.) Mr. Mascaro is a felon convicted of "giving false information to a cop," who was incarcerated at the time of the deposition. (*See id.* at 82-83.) He wrote a letter from jail dated January 5, 2015 in which he confessed that he perpetrated an arson on a warehouse in Valencia with the initials "GT" in October 2009. (*Id.* at 22-23, 65-66.) At the deposition, Mr. Mascaro testified as follows: In 2009, Mr. Mascaro, an electrician, received a call "out of the blue" from a person who identified himself as "Sergio"[10] about a job requiring electrical work at Sergio's house. (*Id.* at 26.) When Mr. Mascaro went to Sergio's house and observed the "really nice cars" in his garage,

_____

[10] Mr. Mascaro does not identify Sergio's last name. The Court assumes Sergio is Mr. Ramirez.

he decided he "was probably going to try and come up on him, steal something from him, get something of value," and "[c]ase it out." (*Id.* at 30.)  Mr. Mascaro admitted he was a thief. (*Id.*)  Mr. Mascaro averred that Sergio understood Mr. Mascaro's intent to "come up on him," but that he nevertheless asked Mr. Mascaro, "[W]ould you want to get some quick money another way?" (*Id.* at 32.)  Mr. Mascaro assented. (*Id.*)

Over lunch a few days later, Sergio told Mr. Mascaro that he wanted a building burned down. (*Id.* at 34.)  Mr. Mascaro and Sergio went to the Globotech building, and Mr. Mascaro entered through the roof. (*See id.* at 36-42.)  Mr. Mascaro let Sergio in, and after a few attempts, Sergio disabled the alarm. (*Id.* at 42-43.)  The two spent less than an hour looking around, and Mr. Mascaro remarked that he "would need a whole bunch of gas." (*Id.* at 44-45.)  They exited the building through the side door, with Sergio rearming the alarm. (*Id.* at 46.)  The two agreed to a price of $10,000 to set the fire. (*Id.* at 47.)  Sergio gave Mr. Mascaro the alarm code. (*Id.* at 51.)  Mr. Mascaro described how he and his associates "[d]id some drugs before" disarming the door and setting the fire. (*Id.* at 55; *see id.*at 53-62.)

Mr. Mascaro said he "'fessed up" to the arson knowing "it's been past the statutory limits," so he was "not going to get in trouble for this." (*Id.* at 24; *see also id.* at 84-85.)  Mr. Mascaro did not keep phone records reflecting calls he had with Sergio, Sergio's business card, or the note on which he wrote the code for the door alarm; and he did not remember the code for the door alarm, the telephone number of the device he used in his communications with Sergio, or the precise location or appearance of Sergio's house. (*See id.* at 26-27, 42, 49-51, 64.)  Mr. Mascaro refused to name his associates or the person who informed him that someone else had been convicted of setting the fire. (*See id.* at 69, 73, 81-82.)  Mr. Mascaro said he had never met a person named John Valerio and knew nothing about Sergio's business partner. (*See id.* at 80.)

In a habeas petition before the California Court of Appeal, Petitioner argued that Mr. Mascaro's deposition testimony presents new evidence showing Petitioner is actually innocent. (LD 11, at 71-75.) The Court of Appeal denied the petition, opining as to this ground: "[P]etitioner fails to demonstrate the existence of 'new evidence' that is of 'such decisive force and value that it would have more likely than not changed the outcome at trial.' (Pen. Code, § 1473, subds. (b)(3)(A), (B).)" (LD 12, at 1-2.) Presented with this claim in a subsequent habeas petition (LD 13, at 65-68), the California Supreme Court denied the petition without comment. (ECF No. 1-3, Exhibit 11, at 120.)

3. Discussion

The state courts' rejection of Petitioner's actual innocence claim cannot be contrary to, or an unreasonable application of, clearly established federal law because the United States Supreme Court never has held that a freestanding actual innocence claim is a cognizable basis for federal habeas relief. *See McQuiggin*, 569 U.S. at 392. Indeed, the Supreme Court has acknowledged it is an "open question." *Osborne*, 557 U.S. at 71. Where Supreme Court cases "give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) (citations, quotation marks, and brackets omitted). Thus, Petitioner has not met his threshold showing pursuant to AEDPA because the federal law he invokes is not clearly established.

Even assuming that a freestanding actual innocence claim in a noncapital case were cognizable in a habeas proceeding governed by AEDPA, Petitioner's evidentiary showing does not meet the exacting standards for such a claim. Petitioner proffers no "new and reliable physical evidence . . . that would preclude any possibility of [his] guilt," nor persuasive scientific or testimonial evidence. *Jones*, 763 F.3d at 1251 (citation and quotation marks omitted).

Respondent argues that Mr. Mascaro's testimony was untrustworthy. (*See* Answer at 70-72.) The Court agrees. There are myriad reasons a reasonable juror could discount Mr. Mascaro's testimony. Mr. Mascaro is a felon who was convicted of "giving false information to a cop." (ECF No. 1-3, at 82-83.) In other words, he suffered a criminal judgment predicated on his dishonesty, which diminishes his credibility. *See Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011) ("[C]onvicted felons have diminished credibility."); *cf. Coleman v. Diaz*, No. CV 10-02343-VBF-RNB, 2014 U.S. Dist. LEXIS 64748, at *21-23, 2014 WL 1795157, at *7 (C.D. Cal. Mar. 11, 2014) (citing cases for the proposition that a declarant's status as a convicted felon undermined his proffered testimony). Other admissions by Mr. Mascaro similarly do not paint him as a particularly credible witness: he had been arrested many times, spent a nontrivial amount of time incarcerated, used drugs, and described himself as a thief. (*See id.* at 30, 55, 82-83.) He states that one of the reasons he chose to step forward when he did was because the statute of limitations had expired, and he knew he could not be prosecuted for the arson. (*See id.* at 24, 84-85.) For any of these reasons, a reasonable juror could find Mr. Mascaro's account less than credible—or, at the very least, could weigh his testimony against the weight of evidence presented at trial and conclude that Petitioner was guilty. *See Schlup*, 513 U.S. at 332 (In assessing whether a claim of actual innocence may allow a petitioner to avoid a procedural bar, "the court may consider how . . . the likely credibility of the affiants bear on the probable reliability of that evidence.").

While Mr. Mascaro's deposition testimony may cast doubt on Petitioner's guilt, it is not the sort of "credible confession" providing affirmative proof of Petitioner's innocence that would justify habeas relief for a freestanding actual innocence claim. *Gimenez v. Ochoa*, 821 F.3d 1136, 1146 (9th Cir. 2016); *see also Jones*, 763 F.3d at 1251 ("Evidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is

insufficient to merit relief . . . ."); *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (en banc) ("Although Dunbar's confession exonerating [the petitioner] does constitute some evidence tending affirmatively to show [the petitioner's] innocence, we cannot completely ignore . . . [Dunbar's] history of lying. Accordingly, the confession by itself falls short of affirmatively proving that [the petitioner] more likely than not is innocent.").

Considering all the evidence, the Court concludes that Petitioner has failed to establish that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. Accordingly, even if this claim were cognizable, Petitioner does not meet the extraordinarily high threshold to show he is actually innocent. Petitioner is not entitled to relief on Ground Three of the Petition.

## VI.    CONCLUSION

IT THEREFORE IS ORDERED that the Petition is denied and that judgment shall be entered dismissing this action with prejudice.

DATED:  November 25, 2019

_____
MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE